# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### April 21, 2016 Session

## BEACON4, LLC v. I & L INVESTMENTS, LLC

**Appeal from the Chancery Court for Sullivan County (Blountville)**
**No. C0017671     E.G. Moody, Chancellor**

---

### No. E2015-01298-COA-R3-CV-FILED-AUGUST 30, 2016

---

This case involves a contract dispute over the construction of a "Fireworks Over America" retail store in Blountville, Tennessee ("FOA Project"). The defendant company, I & L Investments, LLC ("I & L"), sought to build the store on an 11.71-acre tract of undeveloped property that it had acquired in November 2010. A contracting and development corporation, Altera Development, Inc. ("Altera"), submitted a bid to complete the site work and building construction for the FOA Project.[1] At this time, the plaintiff contractor, Beacon4, LLC ("Beacon4"), had been entering into a relationship with Altera in which Altera would market and secure construction work to be performed by Beacon4. Upon I & L's acceptance of Altera's bid, Beacon4 eventually became the designated contractor for both the building and site portions of the FOA project, which was divided into two contracts. On January 28, 2011, Beacon4 obtained its Tennessee general contractor's license with a monetary limit of $1,100,000.00 plus ten percent. On February 7, 2011, I & L and Beacon4 entered into a site contract, valued at $795,486.00, and a building contract, valued at $1,097,115.00. A certificate of occupancy was granted for the FOA store on May 17, 2011. One year later, Beacon4 filed a complaint alleging that I & L had violated the Prompt Pay Act of 1991, *see* Tenn. Code Ann. §§ 66-34-101 to -602, and breached the parties' site contract. Beacon4 sought, *inter alia*, enforcement of a mechanics' and materialmen's lien in the amount of $212,856.02 allegedly owed under the site contract. I & L conceded that it had withheld a retainage of $46,942.75 but otherwise asserted affirmative defenses, including, *inter alia*, that Beacon4 had willfully and grossly exaggerated the lien claim and had violated the Tennessee Contractor's Licensing Act of 1994, *see* Tenn. Code Ann. §§ 62-6-101 to 62-6-521, by dividing the Project into two contracts in order to circumvent its monetary licensing limit. I & L also filed a counterclaim, alleging that Beacon4 had violated the Tennessee Consumer Protection Act of 1977, pursuant to Tennessee Code Annotated § 47-18-104(b)(35). Following a five-day bench trial, the trial court dismissed I & L's counterclaim and entered a judgment in favor of Beacon4, finding that I & L had violated the Prompt Pay

---

[1] Altera is not a party to this appeal.

Act and breached the parties' site contract. The court awarded to Beacon4 $150,390.04 plus six-percent interest per annum, reasonable attorney's fees, and, upon a post-trial motion, out-of-pocket expenses. The court also granted a lien in favor of Beacon4 on the title to I & L's Blountville FOA store property. I & L has appealed the trial court's judgment, and Beacon4 has raised an issue regarding the statutory penalty provided in the Prompt Pay Act and has requested attorney's fees on appeal. Having determined that the trial court made a typographical error in entering the final award of interest to Beacon4, we modify the award of interest from $32,715.76 to $31,715.76. We affirm the judgment in all other respects. Having also determined that an award to Beacon4 of reasonable attorney's fees on appeal is appropriate under the PPA, we remand for the trial court to determine reasonable attorney's fees incurred by Beacon4 during the appellate process.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed as Modified; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and JOHN W. MCCLARTY, JJ., joined.

Rick J. Bearfield, Johnson City, Tennessee, for the appellant, I & L Investments, LLC.

Mark S. Dessauer, Kingsport, Tennessee, for the appellee, Beacon4, LLC.

**OPINION**

I. Factual and Procedural Background

I & L is registered as a Tennessee limited liability company and has principal offices located in Springfield, Missouri. At the time of the subject contracts' execution, I & L was owned one-half by Phil Lloyd and one-half by Mike Ingram. Mr. Ingram testified at trial that I & L is primarily a real estate investment company but that he and Mr. Lloyd also own companies that are in the retail fireworks business. In November 2010, I & L purchased an 11.71-acre tract of unimproved real property in Blountville, Tennessee, at the intersection of Interstate 81 and State Route 394, with the intention of building the FOA Project on a portion of the property. I & L recorded a special warranty deed for the property with the Sullivan County Register's Office on November 16, 2010. I & L subsequently retained the services of Benchmark Designs, PLC ("Benchmark") to prepare site development plans for the FOA Project, consisting of a retail store building, a parking lot, and an access road connecting State Route 394 to the proposed parking lot. The Sullivan County Planning Commission approved the site development plans on November 23, 2010.

2

I & L also retained a Missouri-based architectural firm, Butler, Rosenbury & Partners ("the Butler Firm"). The president of the Butler Firm, Geoffrey Butler, entered into an oral agreement with Mr. Ingram to provide construction management services for the FOA Project. Mr. Butler testified at trial that although he was an architect licensed in eighteen states, he was not licensed in Tennessee. Mr. Butler stated that personally he had designed "somewhere over a dozen" retail and wholesale fireworks facilities across the United States for Mr. Ingram, either for I & L or for other companies with which Mr. Ingram was associated. He testified that the plans and specifications for the FOA building were "sealed" by an architect employed by the Butler Firm, Bruce Adib-Yazdi, who was licensed in Tennessee.

Mr. Butler further testified that the contract for the FOA Project was "put out to bid" to two contractors, one of which was Altera. In December 2010, Van Gladney, a partner in Altera, submitted to I & L a site construction quote in the amount of $1,110,430.00 and a shell, or building, construction quote in the amount of $452,700.00. In an undated cover letter to Mr. Ingram concerning Altera's quote, Mr. Gladney stated: "For ease of understanding, we have clearly separated our quote into two separate sections: Site and Building Shell." According to a "Schedule Overview" attached to Altera's quote, the anticipated date of completion for the FOA Project would be no later than April 30, 2011. Testimony demonstrated that on December 23, 2010, Mr. Ingram and Mr. Butler participated in a conference call with Mr. Gladney during which Mr. Ingram told Mr. Gladney that I & L would be awarding the overall contract to Altera but needed to negotiate a lower price for the site construction. After reviewing the plans and specifications, Mr. Gladney reduced the quote to complete the site construction to $795,486.00.

At the time the subject negotiations were taking place, Beacon4 had entered into a relationship with Altera wherein Altera was to act in a marketing role to secure construction contracts for work that Beacon4 would perform. Beacon4 is a limited liability company registered in Tennessee but with principal offices located in Alabama. In December 2010, Beacon4 had four principal owners: James Rolfe Russell, Morton Carl, Steve Bartek, and Jonathan Gulledge. Mr. Russell, who testified that he was a construction consultant with a mechanical engineering degree, explained that Beacon4 was originally formed in 2005 as a property development company and had evolved into a construction company by 2007.

Mr. Russell further testified that Mr. Gladney initially contacted Beacon4 on December 7, 2010, requesting pricing to construct a metal building for a fireworks store according to a set of tentative plans provided to Beacon4 by Altera. Beacon4 provided estimated pricing to Altera. However, according to Mr. Russell, Beacon4 was not otherwise involved in developing Altera's quote to I & L for the FOA Project. Mr.

3

Russell stated that Beacon4's preliminary understanding with Altera was that if Altera secured contracts for construction of a fireworks store, Beacon4 would construct the building while Altera completed the site work.

It is undisputed that Mr. Butler drafted two contracts concerning the FOA Project: one for construction of the building that would become the FOA store ("Building Contract") and one for development of the site on which the FOA store would be located ("Site Contract"). Undisputed testimony by Mr. Russell and Mr. Butler indicated that Altera encountered obstacles in its attempt to obtain a Tennessee contractor's license. According to Mr. Russell, at some point in December 2010, Mr. Gladney requested that Beacon4 act as the general contractor for the Site Contract as well as the Building Contract. Mr. Russell had achieved a passing score on the TN BC-B Business and Law Management examination on October 14, 2010, and had subsequently submitted an application on behalf of Beacon4 for a Tennessee contractor's license.

On January 28, 2011, the State of Tennessee issued to Beacon4 a contractor's license, authorizing it to complete commercial construction contracts valued up to $1,100,000.00 with a tolerance level of ten percent over the monetary limitation. *See* Tenn. Comp. R. & Regs. 0680-01-.13(3) ("A tolerance of ten percent (10%) will be allowed on the monetary limitation placed on any classification of a license other than a Limited Residential license."). While this license was still pending in late December 2010 or early January 2011, Mr. Russell informed Mr. Gladney that Beacon4 would be willing to undertake completion of the Site Contract as well as the Building Contract. Mr. Russell testified that he believed the Site Contract and Building Contract would be considered two separate contracts for purposes of the monetary limit on Beacon4's contractor's license. According to Mr. Russell, Mr. Gladney continued in the role of "director for the construction project" throughout completion of the FOA Project. Mr. Russell explained that Beacon4's original agreement with Altera was for Altera to receive a share of Beacon4's profits from the FOA Project. He acknowledged that Beacon4 had paid Altera "in the neighborhood of $100,000.00" near the completion of the FOA Project as a way of "settling out with Altera."

Mr. Butler testified that he initially learned of Beacon4's existence during a January 13, 2011 conference call while he was in the process of drafting the Building Contract and Site Contract. Participants in the conference call included Mr. Butler, Mr. Gladney, Mr. Russell, and Mr. Carl. Mr. Butler further testified that he did not finalize the contracts until late January or early February 2011. Mr. Butler acknowledged that by the time he had completed drafting the contracts, he identified Beacon4, rather than Altera, as the contractor. Beacon4 and I & L entered into the Site Contract for a total cost of $795,486.00 and the Building Contract for a total cost of $1,097,115.00. Both contracts were dated February 7, 2011, with Mr. Carl signing the contracts as Beacon4's

4

representative on February 7, 2011, and Mr. Ingram signing the contracts as I & L's representative the following day.

The Building Contract and the Site Contract each respectively included a provision that "[t]he Contractor shall achieve Substantial Completion of the entire Work not later than May 10th, 2011." Undisputed testimony demonstrated that I & L had established a deadline of Memorial Day 2011 for the FOA store to be open for business in Blountville to take advantage of the summer season. Mr. Ingram testified that approximately seventy percent of fireworks sales occur seasonally between Memorial Day and July 5 and that it would have been "a devastating blow" to I & L's business if the Blountville FOA had not been open for Memorial Day 2011. The Sullivan County Building Commissioner issued a certificate of occupancy on May 17, 2011, and the FOA store was open for business prior to the 2011 Memorial Day weekend.[2]

In an effort to comply with the undisputedly compressed construction schedule, the grading subcontractor for the FOA Project, Vic Davis Construction, Inc. ("VDC"), began work on the construction site prior to execution of a written Site Contract or grading subcontract. Daniel Victor Davis testified that as owner and president of VDC, he was a contractor licensed in Tennessee in excavation and grading. According to Mr. Davis, he was initially contacted regarding the FOA Project in early December 2010 by Mr. Carl (of Beacon4) with the understanding that Altera would be the general contractor for the Site Contract. VDC submitted two price quotes for the grading and excavation work, including site utilities. The first quote, dated December 16, 2010, identified I & L as the recipient and reflected a total estimated cost in the amount of $742,250.00. Mr. Davis testified that, working with his estimator, he derived this quote after reviewing Benchmark's original design plans for the FOA Project.

Mr. Davis revised the initial grading quote following a December 17, 2010 telephone conference call with Mr. Carl, Mr. Gladney, and Bob Strottman, who was a second partner in Altera. According to Mr. Davis, Mr. Strottman proposed a cost-saving measure of raising the finished floor elevation four feet above the original planned elevation, thereby requiring less removal of ground material at the construction site. VDC's subsequent quote reflected incorporation of this suggestion with a revised estimated cost for the grading subcontract in the amount of $525,820.00. On December 30, 2010, Mr. Gladney, signing as "Project Manager, Altera Development Company," sent VDC a "Notice of Intent" to hire VDC's services according to VDC's revised bid in "an amount not to exceed $565,820.00." Although VDC's revised written quote is dated January 21, 2011, it includes a note from Mr. Davis that it "reflects our discussion on Friday 12/17/10 regarding raising the site by 4 feet."

---

[2] This Court takes judicial notice that in 2011, the Memorial Day holiday fell on May 30. *See* Tenn. R. Evid. 201(b)(2).

Altera's notice of intent to VDC included the following provision regarding scheduling of the site work:

> It is essential that Altera is delivered a pad ready site to pour a concrete pad upon no later than February 1, 2011. For every day prior to February 1, 2011 that the pad is delivered to Altera Development, we will pay Vic Davis Construction $500 per day up to $5000 or the 20th of January.

Mr. Davis testified that upon receipt of the notice of intent from Altera, VDC began site work on the FOA Project on January 2, 2011. VDC subsequently entered into a written "Sub-Contract Agreement" ("Grading Subcontract") with Beacon4 as the contractor on February 16, 2011. The Grading Subcontract provided that Beacon4 would pay to VDC a total of $539,608.00 for completion of agreed site work.

Mr. Butler testified that prior to execution of the contracts, he visited the FOA Project site on January 25, 2011, in part to meet with Mr. Davis regarding Beacon4's first pay application for work completed by VDC.[3] Their meeting took place at an Arby's Restaurant ("Arby's") near the FOA Project site, which remained a meeting place for those involved in the project. It is undisputed that by the time of this meeting between Mr. Davis and Mr. Butler, VDC had nearly completed the building pad and was proceeding to the remaining grading work on the FOA Project site. Mr. Davis testified that when he met with Mr. Butler on January 25, 2011, he requested revised site development plans to accommodate the four-foot elevation rise on all affected parts of the site. According to Mr. Davis, Mr. Butler responded that he did not need a civil engineer to revise the plans and that he would draw them himself. Mr. Butler testified that he responded negatively to Mr. Davis's request to have the original civil engineer provide a revised plan because I & L "could not get a new grading plan done." He further testified that the civil engineer I & L previously had retained was "not cooperating" and "was not happy that [I & L was] not following his plans to the letter." When Mr. Butler finalized the Site Contract, he prepared an addendum entitled "Revised Grading Plan," identified as "Exhibit H" to the Site Contract. Mr. Butler acknowledged that he was not a civil engineer.

The Revised Grading Plan consists of a freehand diagram designed by Mr. Butler as a modification to raise the floor elevation by four feet. As Mr. Butler explained:

---

[3] Following execution of the Site Contract, Mr. Butler approved Beacon4's first pay application in the amount of $265,667.37 for site work completed by VDC.

I took Benchmark's grading plan and I marked it up and because we had raised the building pad four feet I merely used the finished floor elevation of the building as 100 and all the grades that I presented were in relation to that 100 elevation.

One of four addenda attached to the Site Contract prior to its execution, "Addendum Number Two" or "Exhibit E," provides the following in relevant part:

C-3 Site Grading Plan

Raise the building finish floor elevation 4 feet. Adjust all related site grades accordingly. Grade the site immediately around the building per the new Revised Grading Plan dated February 3rd – attached hereto.

Mr. Butler prepared the Site Contract using a form provided by the American Institute of Architects, specifically the A101$^{TM}$-2007 "Standard Form of Agreement Between Owner and Contractor where the basis of payment is a Stipulated Sum," which incorporates "AIA Document A201$^{TM}$-2007 General Conditions of the Contract for Construction" ("the General Conditions"). Article § 8.1 of the Site Contract does provide, however, that "[w]here reference is made in this Agreement to a provision of AIA Document A201-2007 or another Contract Document, the reference refers to that provision as amended or supplemented by other provisions of the Contract Documents." Article § 5.1.1 of the Site Contract provides for I & L to make progress payments to Beacon4 "[b]ased upon Applications for Payment submitted to the Architect by the Contractor and Certificates for Payment issued by the Architect . . . ." Article § 6.1 further provides that "[t]he Architect will serve as Initial Decision Maker pursuant to Section 15.2 of AIA Document[.]"

It is undisputed that throughout the FOA Project, Mr. Butler, as I & L's project manager, acted in the architect role provided in the Site Contract and was responsible for approval or disapproval of Beacon4's applications for payment, as well as any change order requests ("CORs") submitted by Beacon4. Article 7.2.1 of the General Conditions defines a change order ("CO") as

a written instrument prepared by the Architect and signed by the Owner, Contractor and Architect stating their agreement upon all of the following:
> .1     The change in the Work;
> .2     The amount of the adjustment, if any, in the Contract Sum; and
> .3     The extent of the adjustment, if any, in the Contract Time.

Mr. Ingram testified that I & L engaged Mr. Butler and designated him "as I & L's agent to deal with the contractors" on the FOA Project. Mr. Ingram acknowledged relying on Mr. Butler to inform him concerning whether additional monies were owed to Beacon4 and whether pay applications from the contractor should be paid.

I & L remitted the final payment to Beacon4 under the Building Contract on September 8, 2011, closing out that portion of the FOA Project according to all concerned. All disputes giving rise to the instant action arose under the Site Contract. Beacon4's lien claim against I & L consists essentially of two parts: (1) a retainage withheld by I & L for work that the parties agree Beacon4 completed within the scope of the Site Contract, *see* Tenn. Code Ann. § 66-34-103(a) (providing for the withholding of a retainage of no more than five percent of the contract amount pending completion of a construction contract), and (2) disputed CORs for items of site work that Beacon4 asserts were outside the scope of the Site Contract but that I & L asserts were within the Site Contract's scope. I & L does not dispute that Beacon4, often acting through its subcontractors, completed the site work delineated in the CORs.

The bulk of the disputed CORs concerns work performed by VDC that Beacon4 asserts was outside the scope of work described in the Site Contract, including the incorporation of Exhibit H, Mr. Butler's freehand diagram purportedly depicting the adjustment of all related site grades to accommodate the four-foot rise in the floor elevation. Although Mr. Davis testified that he was provided with a copy of Mr. Butler's drawing in February 2011, it is undisputed that Exhibit H was not attached to VDC's Grading Subcontract. I & L therefore asserts that a discrepancy in the scope of grading work existed between the Site Contract and the Grading Subcontract, for which Beacon4 was responsible. Beacon4 asserts, however, and the trial court ultimately found, that ambiguities in the Site Contract and in Exhibit H, caused in part by I & L's refusal to engage a civil engineer to design the adjustment in elevation, caused a situation in which VDC had to perform work outside the scope of the Site Contract in order to properly grade the site.

Mr. Davis testified that on April 20, 2011, he met at Arby's with Mr. Butler, Mr. Carl, Mr. Gladney, and a concrete subcontractor to discuss additional site grading work Mr. Davis believed had been required beyond the parameters depicted in Mr. Butler's drawing (Exhibit H). According to Mr. Davis, Mr. Butler agreed during this meeting to recommend that I & L obtain an "as-built survey" with the objective of having the survey aid in defining the completed grading work that was outside the scope of the Site Contract, inclusive of Exhibit H. Although Beacon4's related COR set forth additional fees in the amount of $33,270.20 for several thousand cubic yards of excavation, Mr. Butler indicated in an April 25, 2011 electronic mail message that he could support a CO

in the amount of only $4,500.00, including $900.00 to pay the surveyor's fee and $3,600.00 for 300 cubic yards of fill work outside the scope of the Site Contract.

Timothy Lingerfelt, who previously had worked as a subcontractor providing construction staking for the FOA Project, testified that he completed the as-built survey, which was dated June 27, 2011. Mr. Butler did not refute that he and Mr. Davis had discussed the use of an as-built survey as a measure of additional grading work during their April 21, 2011 meeting. Mr. Butler testified, however, that upon reviewing the Site Contract, he had concluded that the additional excavation was within the Site Contract's scope of work. Mr. Butler acknowledged that following I & L's receipt of a demand letter for final payment from Beacon4 in October 2011, he denied the related CO he had initially approved in the amount of $4,500.00. Mr. Butler stated that as part of his final review of the Site Contract, he realized that he had erred in approving any additional fees for site grading because he believed all of the grading performed to have been within the Site Contract's original scope of work.

Beacon4 presented the testimony of an expert witness in civil engineering, Stephen Ellis, who had compared the original Benchmark design plans, Mr. Butler's drawing for elevation adjustments ("Exhibit H"), and the as-built survey. When questioned regarding whether additional grading quantities were required beyond what could be deduced from the original Benchmark plans and Exhibit H, Mr. Ellis calculated that additional quantities were needed of "approximately 1,400 yards of material in the back of the site for the driveway and approximately 2,000 yards of material for the overflow parking and for the slope going down to the detention basin and raising it up." Mr. Ellis further testified that Mr. Butler's drawing concentrated on the elevation level "around the building" and the "front parking lot" but did not address necessary adjustments "to the overflow parking area or tying into where the detention basin was . . . ." Mr. Lingerfelt's testimony corroborated Mr. Ellis's testimony.

As to fulfillment of work on the FOA Project site, Mr. Davis testified that by August 30, 2011, VDC had performed a "punch list" of corrective site work identified by Mr. Butler as necessary for final completion of the project. Undisputed testimony indicated that the parties had agreed to wait until Labor Day weekend in 2011 to have a final topcoat of asphalt laid by a paving subcontractor, Pave-Well Paving Company ("Pave-Well"), engaged by Beacon4.[4] Although Mr. Butler delineated purportedly unresolved "deficiencies" in the site work in a November 23, 2011 letter withholding final payment to Beacon4, Mr. Butler acknowledged at trial that he at no time placed a monetary amount on any additional corrective work needed. On October 17, 2011, Mr. Butler approved a "joint check" in the amount of $30,000.00 to Beacon4 and Pave-Well.

---

[4] This Court takes judicial notice that in 2011, the Labor Day holiday fell on September 5. *See* Tenn. R. Evid. 201(b)(2).

9

This check proved to be the last payment made to Beacon4 by I & L before the instant action commenced.

In a letter dated November 15, 2011, counsel formerly retained by Beacon4, attorney David K. Taylor, issued to I & L a demand for payment in the amount of $167,293.91. Mr. Taylor asserted that this total amount included $48,442.77 in retainage, $27,247.01 in "change order amounts approved but not paid," and $91,604.13 in "disputed change order amounts not resolved after the recent unsuccessful meeting . . . ." The meeting to which Mr. Taylor referred occurred in early October 2011 when Mr. Russell and Mr. Strottman traveled to Mr. Butler's office in Springfield, Missouri, for a meeting with Mr. Butler and Mr. Ingram. Although Mr. Butler in his testimony characterized this meeting as a "mediation," he acknowledged that no neutral third party was present. Mr. Russell testified that although Mr. Ingram was present, Mr. Ingram "didn't offer a lot of comment one way or the other."

Beacon4 presented subsequent correspondence in which Mr. Russell, writing on October 17, 2011, requested negotiation of previously disapproved CORs with Mr. Lloyd or Mr. Ingram, rather than Mr. Butler. In an electronic mail message dated October 22, 2011, Mr. Butler refused Mr. Russell's request on behalf of I & L, stating, *inter alia*, that a twenty-one-day deadline provided in the General Conditions for asserting disputed claims had lapsed as to four of the unapproved CORs. Mr. Butler maintained in his October 22, 2011 message that because Beacon4 had not contested his decision to disapprove CORs or portions of CORs in writing within twenty-one days of each initial disapproval, Beacon4 had forfeited its right to dispute or mediate four previously disapproved CORs.

In contrast, Mr. Russell testified that beginning in March 2011, he realized that the relationship between Beacon4 and Mr. Butler had become adversarial. According to Mr. Russell, he believed at the time that Beacon4 was "not going to receive . . . a fair valuation on change orders." Mr. Russell stated that as a representative of Beacon4, he believed it was a priority to finish the FOA Project on time, keep track of unpaid amounts and unapproved CORs, avoid signing "documents saying that we were in agreement with anything," and "hopefully be able to raise those issues later with the owner directly and hope he would be reasonable with us." The Site Contract itself provides for dispute resolution upon the complaining party's "reduc[ing] to writing in letter form" the dispute with a request for mediation. According to the Site Contract, "each party shall meet and confer at least once within fifteen working days of receipt of the letter and attempt to resolve the dispute, disagreement or problem in good faith." Such a meeting is provided as "a condition precedent to the institution of litigation or other legal proceeding."

Mr. Butler testified that in January 2012, he created a chart of CORs, including approved and disapproved items, and added contractual administrative credit for approved COs, as well as statutory interest on the retainage withheld by I & L. Mr. Butler thus arrived at a "final" amount owed to Beacon4 by I & L of $62,297.00. In April 2012, I & L sent Beacon4's owners a letter advising them that a "final" check in the amount of $62,297.00 was available to be picked up, provided that a Beacon4 representative and Mr. Davis of VDC execute an "appropriate lien release." Beacon4 and VDC declined to execute lien releases. It is undisputed that the $62,297.00 I & L offered to Beacon4 in April 2012 remained at time of trial in an interest-bearing escrow account. *See* Tenn. Code Ann. § 66-34-104(a) (providing in relevant part that when an owner retains a portion of the contract price, "that retained amount shall be deposited in a separate, interest-bearing, escrow account with a third party . . . .).

On May 17, 2012, Beacon4 filed a complaint seeking to enforce a mechanics' and materialmen's lien in the amount of $212,856.02 against the real property on which the FOA Project is located. Beacon4 alleged that I & L had violated the Prompt Pay Act of 1991 ("PPA"), *see* Tenn. Code Ann. §§ 66-34-101 to -602, and breached the Site Contract. Beacon4 also requested attorney's fees. I & L filed an answer on July 6, 2012, denying all substantive allegations and asserting affirmative defenses that (1) Beacon4 had willfully and grossly exaggerated the lien claim in violation of Tennessee Code Annotated § 66-11-139 and (2) violated the Tennessee Contractor's Licensing Act of 1994 ("TCLA"), *see* Tenn. Code Ann. §§ 62-6-101 to 62-6-521, through "circumvent[ing] the contracting monetary limit by splitting a contract that exceeded its monetary limit into two smaller contracts." I & L further asserted that Beacon4's alleged damages would therefore be limited to its actual documented expenses. *See* Tenn. Code Ann. § 62-6-103(b). I & L concomitantly filed a counter-complaint, alleging that Beacon4 had violated, *per se*, the Tennessee Consumer Protection Act of 1977 ("TCPA") by exceeding its monetary licensing limit. *See* Tenn. Code Ann. § 47-18-104(b)(35) (providing as an unfair or deceptive act constituting a violation of the TCPA: "Representing that a person is a licensed contractor when such person has not been licensed as required by § 62-6-103 or § 62-6-502 . . . .").

The trial court initially conducted a bench trial over the course of three days on September 29, 2014; September 30, 2014; and October 1, 2014. During trial, I & L conceded that it owed Beacon4 a retainage in the amount of $46,942.75. Upon the trial court's direction, the parties engaged in mediation on November 3, 2014, with no issues resolved. Trial then continued over two additional days on December 15 and 16, 2014. At the close of proof on December 16, 2014, Beacon4 moved, pursuant to Tennessee Rule of Civil Procedure 15.02, to amend the pleadings to conform to the evidence, *inter alia*, to reduce the amount of its lien claim from $212,856.02 to $167,026.15. I & L's counsel objected to the Rule 15.02 motion, arguing that Beacon4 should be held

accountable for allegedly grossly exaggerating its lien claim. Following argument regarding this issue, the court granted Beacon4's motion, allowing amendment of the lien claim to $167,026.15.

On January 15, 2015, the parties each respectively filed proposed findings of fact and conclusions of law. I & L subsequently filed a post-trial brief on January 20, 2015, arguing, *inter alia*, for the first time that Beacon4 had violated the TCLA by offering to engage in and engaging in contracting prior to obtaining its Tennessee contractor's license.

In an opinion and judgment entered April 23, 2015, the trial court found, *inter alia*, that Beacon4 had not violated the TCLA, specifically determining that the Building Contract and Site Contract were two separate contracts and that Beacon4's representatives had exhibited no intent to circumvent the provisions of the TCLA.[5] The court found that I & L had violated the PPA by withholding a retainage in the amount of $46,942.75 beyond the time period permissible following completion of the FOA Project. *See* Tenn. Code Ann. § 66-34-103(b) (providing that a retainage must be released to the contractor "within ninety (90) days after completion of the work or within ninety (90) days after substantial completion of the project for work completed, whichever occurs first."). The court also found that I & L had breached the Site Contract by failing to pay Beacon4 as promised and that Beacon4 had carried its burden of proof to demonstrate that it was due payment on items contained within CORs totaling $103,447.29. The court thereby awarded (1) a judgment to Beacon4 in the amount of $150,390.04; (2) interest on the judgment at a rate of six percent per annum commencing October 17, 2011, through the date of the judgment; and (3) a mechanics' and materialmen's lien on the FOA property in the amount of the judgment and interest.

The trial court further found that through Mr. Butler's actions, I & L had acted in bad faith and with "reckless disregard of Beacon4's contractual rights." Upon this finding of bad faith, the court awarded reasonable attorney's fees to Beacon4 pursuant to the PPA. *See* Tenn. Code Ann. § 66-34-602(b) (providing that "[r]easonable attorney's fees may be awarded against the nonprevailing party; provided, that such nonprevailing party has acted in bad faith."). Expressly finding Mr. Russell's and Mr. Davis's testimony credible, the court further found Mr. Butler's testimony on disputed matters not to be credible. The court also found the expert testimony of Mr. Ellis and the testimony of the surveyor, Mr. Lingerfelt, to be credible. The court determined that Mr. Butler had violated his "duty of impartiality" in fulfilling the role of the architect under the Site Contract to review the contractor's pay applications and CORs. The court stated in its

---

[5] The trial court did not address I & L's argument raised in its post-trial brief that Beacon4 had violated the TCLA by offering to engage in and engaging in contracting prior to obtaining its Tennessee contractor's license.

opinion that "the evidence is overwhelming that, during the course of the Project and thereafter, Mr. Butler showed complete and unequivoca[l] partiality to I&L."

Also finding that I & L was informed prior to execution of the contracts regarding Beacon4's monetary licensing limit, the trial court dismissed I & L's counterclaim under the TCPA. As to I & L's asserted defense that Beacon4 had willfully and grossly exaggerated its lien claim, the court found that Beacon4, through Mr. Russell, had "reasonably believed" that certain consequential damages could be included in the lien claim and that Beacon4 subsequently had appropriately moved to amend its complaint to reduce the lien claim by $45,000.00 to conform to the evidence. The court therefore determined that Beacon4 had not willfully and grossly exaggerated its lien claim.

Upon Beacon4's filing of a computation of interest and affidavit of attorney's fees and out-of-pocket expenses, the trial court entered an amended judgment on May 18, 2015, awarding to Beacon4 interest in the amount requested of $31,715.76; attorney's fees in the amount of $102,163.50; and out-of-pocket expenses in the amount of $8,495.10. The trial court subsequently set aside this amended judgment due to its having inadvertently not received I & L's response to Beacon4's post-judgment pleadings. However, following review of I & L's response, Beacon4's reply to the response, and I & L's surrebuttal to the reply, the trial court subsequently entered a final judgment on June 19, 2015, confirming its earlier awards to Beacon4.[6] The court previously had entered an agreed order on June 3, 2015, awarding to Beacon4 discretionary costs in the amount of $4,464.95. I & L timely appealed.

## II. Issues Presented

I & L presents six issues on appeal, which we have restated slightly as follows:

1.      Whether the trial court erred by finding that Beacon4 did not violate the TCLA.

2.      Whether the trial court erred by finding that Beacon4 did not willfully and grossly exaggerate its lien claim in violation of Tennessee Code Annotated § 66-11-139.

3.      Whether the trial court erred by finding that work performed by Beacon4 and described in disputed CORs was not within the scope of work required by the parties' Site Contract.

---

[6] In an apparent typographical error, the trial court in its final judgment added $1,000.00 to the previously computed and awarded interest, entering an award to Beacon4 of $32,715.76 in interest. We will address this error in a subsequent section of this Opinion.

13

4.      Whether the trial court erred by declining to find that Beacon4 was time-barred from pursuing certain CORs.

5.      Whether the trial court erred by finding that I & L violated the terms of the PPA.

6.      Whether the trial court erred by awarding to Beacon4 attorney's fees and out-of-pocket expenses.

Beacon4 presents two additional issues, which we have similarly restated as follows:

7.      Whether the trial court erred by declining to award to Beacon4 a statutory penalty of $3,000.00 per day upon finding that Tennessee Code Annotated § 66-34-103(e) does not create a civil remedy.

8.      Whether Beacon4 is entitled to recover attorney's fees on appeal.

## III.  Standard of Review

Our review of the trial court's judgment following a non-jury trial is *de novo* upon the record, with a presumption of correctness as to the trial court's findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Rogers v. Louisville Land Co.,* 367 S.W.3d 196, 204 (Tenn. 2012). "In order for the evidence to preponderate against the trial court's findings of fact, the evidence must support another finding of fact with greater convincing effect." *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006) (citing *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

We review the trial court's conclusions of law, including its interpretation of a written agreement, *de novo* with no presumption of correctness. *See Ray Bell Constr. Co., Inc. v. State, Tenn. Dep't of Transp.*, 356 S.W.3d 384, 386 (Tenn. 2011); *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009). While "the amount of damages to be awarded in a particular case is essentially a fact question," "the choice of the proper measure of damages is a question of law . . . ." *GSB Contractors, Inc. v. Hess*, 179 S.W.3d 535, 541 (Tenn. Ct. App. 2005) (quoting *Beaty v. McGraw*, 15 S.W.3d 819, 827 (Tenn. Ct. App. 1998)).

14

Similarly, interpretation of a statute is a question of law, which we review *de novo* with no presumption of correctness. *See In re Estate of Tanner*, 295 S.W.3d 610, 613 (Tenn. 2009). Our Supreme Court has summarized the principles involved in statutory construction as follows:

> When dealing with statutory interpretation, well-defined precepts apply. Our primary objective is to carry out legislative intent without broadening or restricting the statute beyond its intended scope. *Houghton v. Aramark Educ. Res., Inc.*, 90 S.W.3d 676, 678 (Tenn. 2002). In construing legislative enactments, we presume that every word in a statute has meaning and purpose and should be given full effect if the obvious intention of the General Assembly is not violated by so doing. *In re C.K.G.*, 173 S.W.3d 714, 722 (Tenn. 2005). When a statute is clear, we apply the plain meaning without complicating the task. *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004). Our obligation is simply to enforce the written language. *Abels ex rel. Hunt v. Genie Indus., Inc.*, 202 S.W.3d 99, 102 (Tenn. 2006). It is only when a statute is ambiguous that we may reference the broader statutory scheme, the history of the legislation, or other sources. *Parks v. Tenn. Mun. League Risk Mgmt. Pool*, 974 S.W.2d 677, 679 (Tenn. 1998). Further, the language of a statute cannot be considered in a vacuum, but "should be construed, if practicable, so that its component parts are consistent and reasonable." *Marsh v. Henderson*, 221 Tenn. 42, 424 S.W.2d 193, 196 (1968). Any interpretation of the statute that "would render one section of the act repugnant to another" should be avoided. *Tenn. Elec. Power Co. v. City of Chattanooga*, 172 Tenn. 505, 114 S.W.2d 441, 444 (1937). We also must presume that the General Assembly was aware of any prior enactments at the time the legislation passed. *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995).

*Id.* at 613-14.

This Court reviews a trial court's award of attorney's fees according to an abuse of discretion standard. *See Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *In re Estate of Greenamyre*, 219 S.W.3d 877, 886 (Tenn. Ct. App. 2005) ("[A] trial court will be found to have 'abused its discretion' only when it applies an incorrect legal standard, reaches a decision that is illogical, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party.") (internal citations omitted). Similarly, we review a trial court's decision to award attorney's fees pursuant to a discretionary statutory provision according to an abuse of discretion standard. *See Madden Phillips Constr., Inc. v. GGAT*

*Dev. Corp.*, 315 S.W.3d 800, 827 (Tenn. Ct. App. 2009), *perm app. denied* (Tenn. Mar. 15, 2010).

## IV. Tennessee Contractor's Licensing Act of 1994

I & L contends that Beacon4 violated the TCLA, which "requires persons or entities performing activities defined as 'contracting' to have a license, and makes it unlawful for a person or entity to engage in contracting without a license." *See Anchor Pipe Co., Inc. v. Sweeney-Bronze Dev., LLC*, No. M2011-02248-COA-R3-CV, 2012 WL 3144638 at *3 (Tenn. Ct. App. Aug. 2, 2012) (citing Tenn. Code Ann. §§ 62-6-101, 62-6-103(a)); *see also Kyle v. Williams*, 98 S.W.3d 661, 666 (Tenn. 2003) (affirming the trial court's finding that a contractor who lost his Tennessee contractor's license before the completion of the project was unlicensed for purposes of the TCLA). I & L specifically argues that Beacon4 violated the TCLA and thus acted as an unlicensed contractor in two ways: (1) by offering to engage in and engaging in contracting prior to obtaining its contractor's license on January 28, 2011, and (2) by dividing the FOA Project into two contracts (Building Contract and Site Contract) as a method of circumventing the $1,210,000.00 ($1,100,000.00 plus ten percent) monetary limit on its contracting license.

I & L asserts that Beacon4 should only be able to recover actual documented expenses, pursuant to Tennessee Code Annotated § 62-6-103(b) (Supp. 2016), which provides:

> Any contractor required to be licensed under this part who is in violation of this part or the rules and regulations promulgated by the board shall not be permitted to recover any damages in any court other than actual documented expenses that can by shown by clear and convincing proof.

I & L further asserts that by engaging in contracting without a license, Beacon4 willfully and knowingly violated the TCPA, codified at Tennessee Code Annotated § 47-18-104(b)(3) (2013),[7] allegedly entitling I & L to treble its claimed damages of $63,032.00, pursuant to Tennessee Code Annotated § 47-18-109(a)(3) (providing for treble damages

---

[7] Tennessee Code Annotated § 47-18-104(b)(3) provides in pertinent part:

(b)  The following unfair or deceptive acts or practices affecting the conduct of any trade or commerce are declared to be unlawful and in violation of this part:

* * *

(3)  Causing likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by, another.

upon a court's finding that a violation of Tenn. Code Ann. § 47-18-104 was "willful or knowing").

Beacon4 contends that on appeal, I & L has waived its argument regarding the timing of Beacon4's licensure by failing to present the argument during trial. Beacon4 further contends that the trial court properly found that it had not violated the TCLA. Upon our thorough review of the record and applicable authorities, we conclude that I & L waived the issue of whether Beacon4 engaged in contracting prior to obtaining its contracting license. We further conclude that the evidence does not preponderate against the trial court's finding that Beacon4 acted as a licensed contractor and is entitled to its mechanics' and materialmen's lien claim.

## A. Offering to and Engaging in Contracting Prior to Licensure

I & L argues that although the written contracts for the Project were executed in February 2011, Beacon4 offered to engage and orally engaged in contracting prior to obtaining licensure on January 28, 2011, thereby violating the requirements of Tennessee Code Annotated § 62-6-103(a)(1). Beacon4 contends that I & L waived this issue by failing to raise it during trial. We agree with Beacon4 in this respect.

The version of Tennessee Code Annotated § 62-6-103(a)(1) (2009) in effect at the time this action was filed provided:

> Any person, firm or corporation engaged in contracting in this state shall be required to submit evidence of qualification to engage in contracting, and shall be licensed as provided in this part. It is unlawful for any person, firm or corporation to engage in or offer to engage in contracting in the state, unless the person, firm or corporation has been duly licensed under this part. Any person, firm or corporation engaged in contracting, including a person, firm or corporation that engages in the construction of residences or dwellings constructed on private property for the purpose of resale, lease, rent or any other similar purpose, shall be required to submit evidence of qualification to engage in contracting and shall be licensed. It is unlawful for any person, firm or corporation to engage in, or offer to engage in, contracting as described in this subdivision (a)(1) unless the person, firm or corporation has been duly licensed under this part.

I & L acknowledges on appeal that it first raised the issue of whether Beacon4 offered to engage in or engaged in contracting prior to obtaining its Tennessee contractor's license in a post-trial brief. At the close of trial on December 16, 2014, the trial court requested that the parties submit within thirty days proposed findings of fact

17

and conclusions of law, which each party respectively filed on January 15, 2015. Five days later, I & L filed a post-trial brief, arguing issues of law for the most part as it had at trial but, for the first time, asserting as follows in pertinent part:

1) Beacon4 offered to engage in Contracting in Tennessee without having a Contractor's License, in violation of T.C.A. §62-6-103(a)(1);

2) Beacon4 bid on the Project without having a Contractor's License, in violation of T.C.A. §62-6-104(a);

3) Work on the Project, for which Beacon4 submitted pay requests under the Site Contract and for which Beacon4 is seeking money in this lawsuit commenced prior to Beacon4 having a Contractor's License; . . . .

(Footnote omitted.) In finding that Beacon4 had not violated the TCLA, the trial court addressed in detail I & L's allegation that Beacon4 had divided the FOA Project into two contracts in order to circumvent its monetary licensing limit. The trial court, in its 82-page opinion and concomitant judgment, did not address I & L's newly minted assertion that Beacon4 had violated the TCLA by offering to engage in and engaging in contracting prior to obtaining its Tennessee contractor's license.

We conclude that I & L improperly raised this issue subsequent to the presentation of all proof and argument before the trial court and essentially at the last minute. As our Supreme Court has stated: "We are of the opinion that there is little difference between an issue improperly raised before the trial court at the last minute and one that was not raised at all." *In re Adoption of E.N.R.*, 42 S.W.3d 26, 32 (Tenn. 2001) (concluding that a constitutional challenge to the applicable statute raised for the first time during oral argument was not properly presented to the trial court); *see also Induction Techs., Inc. v. Justus*, 295 S.W.3d 264, 268-69 (Tenn. Ct. App. 2008), *perm. app. denied* (Tenn. Oct. 6, 2008) (concluding that an issue regarding the applicability of a statute had been "waived as too late" when presented for the first time in a post-trial motion to alter or amend the judgment).

I & L did not request that the trial court view the evidence, presented over five days of trial and in the span of two months' time, through the lens of this alleged statutory violation. Neither did I & L give notice to Beacon4 during the trial that Beacon4 would have to defend against this allegation. *See, e.g., Woodroof v. Fisher*, 180 S.W.3d 542, 550 (Tenn. Ct. App. 2005), *perm. app. denied* (Tenn. Oct. 3, 2005). In *Woodroof*, this Court found that a father waived the issue of custody of the parties' child

when he failed to raise the issue until the close of trial after six days of hearings upon the issue of visitation. *Id.* As this Court explained: "Fundamental fairness supports the judgment of the trial court, which listened to and evaluated the proof under the impression that visitation was the issue being litigated. [The plaintiff's] party opponents presented evidence and cross-examined witnesses under the same impression." *Id.*

Moreover, the issue of whether Beacon4 violated the TCLA by offering to engage in and engaging in contracting prior to obtaining its contractor's license is not ripe for our review because the trial court did not adjudicate the issue. *See Dorrier v. Dark,* 537 S.W.2d 888, 890 (Tenn. 1976) ("This is a court of appeals and errors, and we are limited in authority to the adjudication of issues that are presented and decided in the trial courts . . . .") (emphasis added). I & L asserts that this issue was tried by implied consent because in pleading that Beacon4 had violated the TCLA, it purportedly gave notice to Beacon4 (and by extension, the trial court) that any violation of the TCLA could be an issue at trial. I & L further asserts that evidence relevant to this issue was presented at trial, including the relationship between Beacon4 and Altera, the entity that, prior to Beacon4's licensure, offered a quote to I & L for the FOA Project and issued a notice to proceed to the grading subcontractor.

I & L seeks to have this Court conflate the two TCLA violations it alleges: (1) a violation involving the monetary licensing limit upon which the trial court made detailed findings of fact and reached a conclusion of law and (2) the instant violation involving Beacon4's actions prior to obtaining its license, which the trial court did not address. Contrary to I & L's argument in this regard, we do not determine the trial court's adjudication dismissing one alleged statutory violation to equate to adjudication of a second and separate violation. Furthermore, as this Court has explained, "'[t]rial by implied consent is not shown by the presentation of evidence that is relevant to an unestablished issue when that evidence is also relevant to the established issue.'" *Christmas Lumber Co., Inc. v. Valiga,* 99 S.W.3d 585, 593 (Tenn. Ct. App. 2002), *perm. app. denied* (Tenn. Feb. 18, 2003) (quoting *McLemore v. Powell,* 968 S.W.2d 799, 803 (Tenn. Ct. App. 1997)). We therefore determine that I & L waived this issue on appeal by failing to raise it properly before the trial court.

## B. Monetary Licensing Limit

It is undisputed that the contracted value of the entire FOA Project, inclusive of the Building Contract and Site Contract, exceeded the monetary limit of Beacon4's contractor's license. At the time of its January 28, 2011 licensure, Beacon4 was assigned a monetary limit of $1,100,000.00 with a tolerance level of ten percent, for a total allowed limit in the amount of $1,210,000.00. *See* Tenn. Comp. R. & Regs. 0680-01-.13(3). Each of the two individual contracts, specifically the Building Contract originally

priced at $1,097,115.00, and the Site Contract, originally priced at $795,486.00, was within Beacon4's limit. I & L asserts that Beacon4 violated the TCLA and acted as an unlicensed contractor by dividing the FOA Project in an intentional effort to circumvent the monetary limit. The trial court found, however, that Beacon4 had assumed the responsibility of the Site Contract in an effort to comply with the TCLA and accommodate the needs of I & L when Altera was not able to obtain its contractor's license. Under the factual circumstances of this case and upon consideration of the applicable authorities, we agree with the trial court's conclusion that Beacon4 did not violate the TCLA.

I & L acknowledges that it can cite to no controlling Tennessee authority in support of its argument that Beacon4's division of the FOA Project into two contracts should be considered a violation of the TCLA. I & L relies on a 1993 opinion issued by the Tennessee Attorney General, OAG 93-12, in which the Attorney General considered the question of "whether a general contractor can get around a $1,000,000 monetary limit on his license to do a $5,000,000 project by entering five separate contracts for five phases of work." Reasoning that the General Assembly did not intend to exempt individuals who subdivided contracting projects from the provisions of the TCLA, the Attorney General opined that "[s]uch a division of work for purposes of avoiding the application of the law would place both the contractor and the owner in violation of the Tennessee Contractors Licensing Act, making each of them guilty of a Class A Misdemeanor." The Attorney General further opined that the contractor "would be considered to be contracting without a license" and would be "precluded from recovering anything but his actual documented expenses" pursuant to Tennessee Code Annotated § 62-6-103(b).

We note, as did the trial court, that although opinions of the Attorney General may be persuasive authority, they are not controlling. *See State v. Black,* 897 S.W.2d 680, 683 (Tenn. 1995) ("Although opinions of the Attorney General are not binding on courts, government officials rely upon them for guidance; therefore, [such] opinion[s are] entitled to considerable deference."); *Whaley v. Holly Hills Mem'l Park, Inc.*, 490 S.W.2d 532, 533 (Tenn. Ct. App. 1972) ("It must be noted that an opinion of the attorney general may be persuasive but is in no way binding authority."). We also determine the hypothesis posed by the question to the Attorney General to be highly factually distinguishable from the case at bar in that the contracts at issue here did not constitute a series of small "phase" contracts.

In contrast, the trial court in its written opinion relied on this Court's 2012 analysis of a question of law directly on point with the broader issue of "whether a contractor who contracts for work above the monetary limit applicable to his license is an unlicensed contractor for purposes of the Contractors Licensing Act of 1994 . . . ." *Anchor Pipe*,

2012 WL 3144638 at *3.[8] In *Anchor Pipe*, the trial court had granted summary judgment in favor of the defendant bank holding a deed of trust for a subdivision upon the court's conclusion that the plaintiff contractor, "Anchor," was an unlicensed contractor and was therefore not entitled to a mechanics' and materialmen's lien. *Id.* at *3. The trial court found that Anchor was unlicensed because Anchor's bids on the subdivision project had exceeded $2,000,000.00 while the monetary limit on its license was $750,000.00. *Id.* This Court reversed the trial court's judgment, determining in relevant part that Anchor had not acted as an unlicensed contractor by exceeding its monetary limit. *Id.* at *4-6. As this Court explained:

We disagree with the trial court's legal conclusion that Anchor should be considered unlicensed. We find instructive the Supreme Court's analysis in *Helton v. Angelopolous,* 629 S.W.2d 15, 16 (Tenn. 1982), a case in which the actual construction costs ended up exceeding the monetary limitations on the contractor's license. *Id.* at 17. The contractor sued the property owner for the unpaid balance on a building contract. In examining the applicable common law and statutory background, the Court noted the underlying public policy of protecting "the consuming public from

---

[8] We note that the version of Tennessee Code Annotated § 62-6-103(a)(1) applicable to this case is the same as the version applied in *Anchor Pipe*. *See Anchor Pipe*, 2012 WL 3144638 at *3. Effective July 1, 2013, the General Assembly amended Tennessee Code Annotated § 62-6-103(a)(1) (Supp. 2016) to read as follows:

(a)(1) Any person, firm or corporation engaged in contracting in this state shall be required to submit evidence of qualification to engage in contracting, and shall be licensed as provided in this part. It is unlawful for any person, firm, or corporation to engage in or offer to engage in contracting for any project in this state, unless, <u>at the time of such engagement or offer to engage</u>, the person, firm, or corporation has been duly licensed <u>with a monetary limitation sufficient to allow the person, firm, or corporation to engage in or offer to engage in such contracting project under this chapter. The board for licensing contractors shall have the authority to grant or allow an exception, in an amount not to exceed ten percent (10%), to the monetary limitation of such license provided in this subdivision (a)(1).</u> Any person, firm, or corporation engaged in contracting, including a person, firm, or corporation that engages in the construction of residences or dwellings constructed on private property for the purpose of resale, lease, rent, or any other similar purpose, shall be required to submit evidence of qualification to engage in contracting and shall be licensed. It is unlawful for any person, firm, or corporation to engage in, or offer to engage in, contracting as described in this subdivision (a)(1) unless the person, firm, or corporation has been duly licensed under this part.

*See* 2013 Pub. Acts. Ch. 469 § 1 (S.B. 835) (emphasis added to highlight language inserted by amendment). Inasmuch as the amended version of the statute is inapplicable to this case, we make no determination regarding the effect of the amendment on a situation in which a contractor has exceeded its monetary licensing limit.

21

unqualified builders." *Id.* The Court went on to distinguish between contractors who are "completely unlicensed" from those "who have complied with the licensing laws . . . and may in some manner violate the provisions or limitations of their respective licenses." *Id.* at 18. As to the monetary limitations on contractors' licenses, the Court found their purpose to be "to afford financial security to owners, vendors and others dealing with a contractor." *Id.*

There was no evidence that the contractor in *Helton* was guilty of any negligence in submitting his bid. *Id.* at 19. The Court observed, however, that there were other means (apart from precluding the contractor from recovering on the contract) for addressing violations by licensed contractors:

> [I]f a licensed general contractor fraudulently, or in bad faith, or through collusion with an architect or engineer, submitted a bid upon a project obviously beyond the monetary limit on his license, ample sanctions, both civil and criminal, are available either through the courts or through the licensing agency. A rather complete statutory scheme exists for dealing with violations of licensed personnel, as contrasted with individuals or firms which, under prior law, undertook to operate in a regulated field without any attempt at compliance with the licensing requirements.

*Id.* Based on this reasoning, the Court reversed the decision of the lower courts dismissing the contractor's claim. *Id.*

While *Helton* was decided based largely on caselaw, we consider its distinction between unlicensed contractors and contractors bidding above the monetary amount of their license to be relevant here. The purpose of the monetary limit is to ensure the contractor's financial security and stability. *Id.* at 18. There is a regulatory scheme set up to address violations of the monetary limits by licensed contractors. *Id.; see* Tenn. Comp. R. & Regs. § 0680-01-.13,-.19. Furthermore, the case before us involves a dispute between a contractor and the bank that provided financing to the developer. It has generally been held that the rule restricting "an unlicensed contractor's access to court does not apply to disputes between contractors and other licensed professionals in the construction business." *Custom Built Homes v. G.S. Hinsen Co., Inc.,* No. 01A01-9511-CV-00513, 1998 WL 960287, at *3 (Tenn. Ct. App. Feb. 6,

1998); *see also Gene Taylor & Sons Plumbing Co., Inc. v. Corondolet Realty Trust,* 611 S.W.2d 572, 575-76 (Tenn. 1981); *Roberts v. Yarbrough,* No. 01-A-01-9802-CH-00096, 1999 WL 43252, at *2 (Tenn. Ct. App. Feb. 1, 1999). This rationale seems equally applicable here where the bank was in the business of approving construction loans and reviewing the credentials of contractors. The public policies underlying Tenn. Code Ann. § 62-6-103(b)—namely, protecting the safety and property of the public— are not implicated in a dispute between knowledgeable professionals.

We, therefore, conclude that Anchor was not an unlicensed contractor under Tenn. Code Ann. § 62-6-103(b).

*Anchor Pipe*, 2012 WL 3144638 at *3-4 (footnote omitted).

We determine the reasoning employed in *Anchor Pipe* applicable to the case at bar. Even if, *arguendo*, Beacon4 exceeded its monetary limit by entering into both the Building Contract and the Site Contract for the FOA Project, this action did not make Beacon4 an unlicensed contractor for purposes of the TCLA. The trial court found that I & L was an entity sophisticated in its dealings in construction development, with a co-owner, Mr. Ingram, and project manager, Mr. Butler, who possessed full knowledge of Beacon4's licensing limits when the two companies entered into the contracts. The court further found that Beacon4's agreement to take over the Site Contract for Altera was an accommodation to I & L's need to complete the FOA Project by the Memorial Day deadline.

Specifically, the trial court stated in its written opinion in pertinent part:

Initially, Beacon4 was to be the contractor under the Building Contract and Altera the contractor under the Site Contract. According to Mr. Russell's testimony, he was approached by Mr. Gladney and told that Altera was having trouble with its licensing and asked if Beacon4 could do the site work. After doing some investigation it was Mr. Russell's belief that they were two separate contracts, with each under Beacon4's monetary limit, Beacon4 elected to go forward as the general contractor for both the Site Contract and the Building Contract.

The Court finds that there was no intent by Beacon4 to circumvent the State of Tennessee's licensing requirements by entering into two (2) contracts for the Project. In fact, the evidence showed that Beacon4 agreed to both contracts as an accommodation to Altera which was, in turn, an accommodation to I&L. Further, the Court finds that the division of the

23

Project into two contracts was based on Beacon4's desire to comply with the law as opposed to circumventing it.

Although I&L seeks to void the Site Contract on the basis that, when the amounts of the Site Contract and Building Contract are added together the total amount exceeds Beacon4's monetary limit of $1,100,000 plus 10%, the Court finds the position of I&L untenable. I&L was fully aware of Beacon4's licensing limit at the time the two contracts were signed. In fact, Mr. Butler testified in his deposition that Beacon4's licensing limit played no role in his or I&L's decision to award the contracts to Beacon4. Further, Mr. Butler, as I&L's agent, administered the two contracts separately from their inception. In addition, the proof showed that Mr. Butler did not raise this issue until his letter of November 23, 2011, after Beacon4 hired counsel and made a demand on I&L for payment of the money it claimed was due on the Site Contract. This was some six (6) months after the building was ready for occupancy and over two (2) months after the Building Contract was closed out on September 8, 2011, without objection. Beacon4's licensing limitation was never a topic of contention or even discussion until it was apparent that the dispute between Beacon4 and I&L could not be resolved. The Court finds that I&L, through Mr. Butler, used the "licensing limit" issue not as a valid legal claim but for negotiating leverage to attempt to persuade Beacon4 to take less than it was owed under the Site Contract.

* * *

Although this is a dispute between a contractor and an owner, the Court views the present facts to present the same issue as was presented in Anchor Pipe, that is, if a contractor contracts for work above its monetary limit, is that contractor unlicensed. Beacon4 was licensed and the Site Contract was within the monetary limits of the license. It is only when one combines the two separate contracts – the Site Contract and the Building Contract – one of which is not at issue here, does the amount exceed [Beacon4's] monetary limit. As in Anchor Pipe, Mr. Ingram, one of the two principals of I&L, although not a lender, was a knowledgeable professional having built multiple fireworks[] stores in various parts of the country. I&L was further assisted by Mr. Butler who negotiated and drafted both contracts and acted as the manager and administrator of the Project. Based on Mr. Butler's testimony, he was very experienced, not only in managing construction projects, but also in working for Mr. Ingram. As stated in Helton v. Angelopoulos, the purpose of the monetary

24

limitations on contractors' licenses is to afford financial security to owners and to protect the safety and property of the public. Neither of those concerns [is] implicated here. In this case, Beacon4 fully performed under both contracts. There is no evidence of concern with public safety on the Project. If the monetary limitation was applied here as requested by I&L, the Court would be in essence allowing an owner to avoid a contractual obligation to its contractor in a case where the Site Contract was fully and timely performed by Beacon4 and I&L accepted and received all the underlying benefits thereof. Such a result would be inconsistent and contrary to the purposes of the Tennessee contractor licensing law. In addition, the Court finds that I&L waived any objections after it concluded the Building Contract without objecting.

The trial court thus found that Beacon4 had not violated the TCLA upon its findings that (1) I & L entered into the two contracts with full knowledge of Beacon4's monetary licensing limit; (2) the parties kept their financial accounting for the Building Contract and Site Contract separate; (3) the Building Contract was resolved separately and fully in September 2011; and (4) I & L raised no issue regarding Beacon4's monetary licensing limit until Beacon4's former counsel, David K. Taylor, issued a demand letter for final payment on the Site Contract in November 2011. Upon our careful review, we determine that the evidence preponderates in favor of the trial court's findings in this regard. Moreover, we agree with the trial court that the purposes of the monetary limitation "'to afford financial security to owners, vendors and others dealing with a contractor'" while "protecting the safety and property of the public" were not implicated by Beacon4's entering separately into the Building Contract and Site Contract. *See Anchor Pipe*, 2012 WL 3144638 at *3-4 (quoting *Helton v. Angelopolous*, 629 S.W.2d 15, 18 (Tenn. 1982)). The trial court did not err by finding that Beacon4 did not violate the TCLA.[9]

---

[9] The trial court further found that even if Beacon4 had violated the TCLA, it would retain the right to a mechanics' and materialmen's lien. *See Anchor Pipe*, 2012 WL 3144638 at *5 (concluding that pursuant to the 1994 enactment of Tennessee Code Annotated § 62-6-128 (2009), *see* 1994 Pub. Acts, Ch. 986, § 16 (H.B. 2507), "outside the context of a single-family residential construction, the fact that a contractor is unlicensed does not result in forfeiture of the contractor's lien."). Having determined that Beacon4 was a licensed contractor for purposes of the FOA Project, we further determine that the issue of whether Beacon4 would have retained its lien rights if unlicensed is pretermitted as moot. We do note that effective July 1, 2013, subsequent to commencement of the instant action and therefore inapplicable here, the General Assembly amended Tennessee Code Annotated § 62-6-103 (Supp. 2016) to add, *inter alia*, the following subsection (c): "Notwithstanding any law to the contrary, no lien otherwise authorized pursuant to title 66, chapter 11 shall be available to any person, firm, or corporation engaged in construction in violation of this chapter." *See* 2013 Pub. Acts Ch. 469 § 2 (S.B. 835).

V.  Willful and Gross Exaggeration of Lien Claim

I & L asserts that Beacon4 violated Tennessee Code Annotated § 66-11-120 by willfully and grossly exaggerating its lien claim in the amount of $212,856.02, an amount $45,000.00 greater that the $167,026.15 Beacon4 actually claimed it was owed by I & L. I & L thereby argues that pursuant to Tennessee Code Annotated § 66-11-139, the trial court should have disallowed I & L's lien claim and awarded to I & L $63,032.00 in expenses it incurred to defend against the claim.  Beacon4's lien claim was supported by an affidavit sworn to by Mr. Russell, who testified at trial that he added $45,000.00 to the amount owed to compensate for "the amount of time and effort that [he] had put into this project, over and above execution of the project."

On appeal, Beacon4 asserts that this issue is moot because following the presentation of evidence by the parties, Beacon4 moved to amend its pleadings to conform to the evidence by reducing its lien claim, pursuant to Tennessee Rule of Civil Procedure 15.02.  The trial court granted Beacon4's Rule 15.02 motion, and Beacon4 reduced its lien claim to $167,026.15.  In the alternative, Beacon4 asserts that the trial court properly found that Beacon4 did not willfully and grossly exaggerate its claim.  We conclude that the evidence does not preponderate against the trial court's finding that Beacon4 did not willfully and grossly exaggerate its lien claim.

Tennessee Code Annotated § 66-11-120 (2015) provides:

> The claims secured by lien for work, labor, materials, equipment, services, machinery, overhead and profit, shall not exceed the contract price and extras in the contract between the owner and the prime contractor.

Tennessee Code Annotated § 66-11-139 (2015) further provides:

> If, in any action to enforce the lien provided by this chapter, the court finds that any lienor has willfully and grossly exaggerated the amount for which that person claims a lien, as stated in that person's notice of lien or pleading filed, in the discretion of the court, no recovery may be allowed thereon, and the lienor may be liable for any actual expenses incurred by the injured party, including attorneys' fees, as a result of the lienor's exaggeration.

*See Silverman v. Gossett*, 553 S.W.2d 581, 585 (Tenn. 1977) (holding the Mechanics' and Materialmen's Lien statutes to be constitutional and explaining that one safeguard for property owners is that what is now Tennessee Code Annotated § 66-11-139, previously codified at § 66-1141, "provides for disallowance entirely if a court finds that a lienor has

willfully and grossly exaggerated his claim."); *see also Dotson v. Gaidos*, 736 S.W.2d 119, 120 (Tenn. Ct. App. 1987) (clarifying that "a willful and gross exaggeration of the claim may allow the court to deny the claimant a lien but, nothing else appearing, it will not defeat the claimant's right to recover the amount justly due.").

Regarding this issue, the trial court stated in its written opinion in pertinent part:

Beacon4's original lien claim was in the amount of $212,856.12. At trial, Beacon4 sought to recover on its lien enforcement/breach of contract claim, the sum of $167,026.15 plus interest. I&L claims that seeking the sum of $167,026.15 at trial while asserting $212,856.12 as its lien claim is willful and gross exaggeration of the lien claim in violation of T.C.A. § 66-11-139. Following the presentation of the evidence by the parties, the Court granted Beacon4's Rule 15.02 motion to amend its pleadings to conform to the evidence and permitted Beacon4 to reduce the amount of its lien claim from $212,856.12 asserted in the notice of lien to $167,026.15 based on its evidence at trial.

* * *

The proof at trial was that the amount of the lien was determined by the amount due Beacon4 under the Site Contract plus certain consequential damages Mr. Russell believed, upon the advice of former counsel, (emphasis added [by trial court]) that Beacon4 could recover. Beacon4 reasonably believed those amounts could be included in its lien claim. Based on this evidence and the absence of contradictory evidence from I&L, the Court concludes that I&L did not meet its burden that the amount for which Beacon4 originally claimed a lien was grossly and willfully exaggerated such that [Beacon4] loses any right to enforce its lien under the *Tennessee Mechanic[s'] and Materialmen's Lien* law. There was also no evidence presented by I&L that it was harmed by this exaggeration. Mr. Ingram testified that I&L did not attempt to bond the lien, nor was there evidence of any attempt by I&L to sell the Property that was delayed or impaired by the amount of this lien. In reaching this conclusion, the Court also takes into account that Beacon4 voluntarily moved to reduce the amount of its lien claim at trial, thereby curing any non-compliance with § 66-11-139 based on the amount of the lien claim sought in Beacon4's pleadings. This means that, regardless of the amount in Beacon4's notice of lien, the amount of its lien enforcement action was limited to $167,026.15 plus interest.

\* \* \*

The Court also notes that a decision under § 66-11-139 to not allow recovery on a lien, even if willfully and grossly exaggerated, is in the discretion of the Court. The Court, based on all the evidence on Beacon4's damages presented at trial and further based on I&L's decision not to contest whether the work was performed, whether the materials were supplied or whether the work benefitted I&L that gave rise to the claim for damages, in its discretion, elects to allow Beacon4's recovery on its lien.

Upon a thorough review of the record, we agree with the trial court's findings on this issue. As the trial court noted, the statutory chapter providing for Mechanics' and Materialmen's Liens, *see* Tenn. Code Ann. §§ 66-11-101 to -208 (2015), does not provide a definition of "willfully and grossly exaggerated" as the phrase is used within the context of the statute. I & L relies in part on this Court's decision applying the statute in *Wimpy v. Holland*, No. 89-81-II, 1989 WL 119446 (Tenn. Ct. App. Oct. 13, 1989), *perm. app. denied* (Tenn. Feb. 20, 1990). In *Wimpy*, this Court affirmed the chancery court's finding that the defendant contractor had willfully and grossly exaggerated his lien claim against the plaintiff homeowners. *Id.* at \*3. We determine the factual situation in *Wimpy* to be highly distinguishable from the situation in the instant action, as did the trial court. The contractor in *Wimpy* had abandoned the project mid-way to completion, filed a lien claim for more than the full amount he previously had been paid for the work he had completed to date, and admitted at trial that he had filed the claim knowing that it would prevent the homeowners from accessing their construction loan to complete the home. *Id.* This Court was not swayed by the contractor's attempt to amend the lien to a lesser amount because the record demonstrated that there was "no basis for a lien of any type . . . ." *Id.*

In contrast, Beacon4 filed its lien claim after completion of the Site Contract.[10] Although the initial claim included $45,000.00 Mr. Russell estimated as compensation for his time spent outside the parameters of the contract, Beacon4 voluntarily amended its claim to remove this $45,000.00 through its Rule 15.02 motion. I & L has presented no proof that the damages claimed to be the result of defending against Beacon4's lien claim generally in this action are traceable to the added $45,000.00. In analyzing an earlier version of Tennessee Code Annotated § 66-11-120, then codified at § 64-1120, our Supreme Court concluded that although the prohibition against exaggeration provides the property owner with a defense against enforcement of a contractor's lien rights, the owner must be able to demonstrate payments in excess of the contract price in order to

---

[10] We will address the completion date of the Site Contract more fully in a subsequent section of this Opinion.

28

exercise the defense. *See Standard Glass & Supply Co. v. Sheley*, 604 S.W.2d 36, 38 (Tenn. 1980). As the Court explained:

> As pointed out by the Court of Appeals, "(m)echanics' and materialmen's liens generally, and T.C.A. s 64-1120 specifically, have an inherently twofold purpose. Such a lien is important from the subcontractor's point of view in that it provides a '. . . method of securing financing . . . since it enables contractors and subcontractors to freely obtain supplies and credit without going through a financing institution. With such statutes, materialmen and laborers who extend credit are protected by a security interest in the real estate they help to improve.' Barnett, 'Mechanics' and Materialmen's Liens in Tennessee: Some Problem Areas,' 5 Mem. St. L. Rev. 359 (1975). However the statute also may be relied upon as a defense by the owner of the property in that the '. . . . limitation that the liens claimed shall in no case exceed the contract price is not a part of the definition of the rights conferred by the statute upon furnishers of labor and material, but is a limitation upon the enforcement of such rights, which may be relied upon by the owner of the property as a defense.' *Richmond Screw Anchor Co. v. Minter Co.,* 156 Tenn. 19, 300 S.W. 574 (1927)." However, the defense set forth in T.C.A. s 64-1120 is not available to the owner unless he can trace payments equal to or in excess of the contract price directly into the hands of furnishers of materials and labor. See *Richmond Screw Anchor Co. v. Minter Co.*, *supra*; *Richardson v. Lanius*, 150 Tenn. 133, 263 S.W. 799 (1923); *Variety Fire Door Co. v. Hanson-Worden*, 10 Tenn. App. 254 (1929).

*Id.*

I & L demonstrated no damages it incurred as a result of the additional $45,000.00 included in the original lien claim and has certainly suffered none since Beacon4 amended its complaint to reduce the claim. The trial court did not abuse its discretion by declining to find that Beacon4 had willfully and grossly exaggerated its lien claim. *See* Tenn. Code Ann. § 66-11-139 (providing, *inter alia*, that denial of recovery for a lien claim based upon willful and gross exaggeration is within the discretion of the trial court).

## VI. Disputed Change Order Requests

I & L contends that the trial court erred by finding that certain disputed CORs Beacon4 submitted to I & L represented work performed outside the scope of work provided in the Site Contract. I & L asserts that the dispute over work performed arose

from Beacon4's failure to include in the Grading Subcontract's scope of work: (1) Mr. Butler's revised grading plan ("Exhibit H" to the Site Contract) and (2) adjustments to all related grades to match the four-foot elevation of the floor grade. I & L also asserts that the trial court erred by declining to find that Beacon4's claims concerning nine of the sixteen CORS that had been denied by I & L were barred due to untimeliness. Beacon4 contends that the trial court correctly considered parol evidence regarding the scope of work in the Site Contract upon the court's finding that the Site Contract was ambiguous in this regard. Beacon4 further contends that based upon its consideration of parol evidence, the trial court properly found that the CORs at issue represented work performed by Beacon4 outside the scope of the Site Contract. Upon our careful review of the record, we conclude that the trial court did not err in finding the Site Contract ambiguous regarding the scope of work. We further conclude that the evidence preponderates in favor of the trial court's findings regarding the CORs.

In interpreting a contract, our "initial task is to determine whether the language in the contract is ambiguous." *Ray Bell*, 356 S.W.3d at 386-87 (citing *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002)). "If the contract language is unambiguous, then the parties' intent is determined from the four corners of the contract." *Ray Bell*, 356 S.W.3d at 387 (citing *Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998)). This Court has explained the principles applied to determine whether the contract language is clear or ambiguous as follows:

> The language in dispute must be examined in the context of the entire agreement. *Cocke County Bd. of Highway Commrs. v. Newport Utils. Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985). The language of a contract is ambiguous when its meaning is uncertain and when it can be fairly construed in more than one way. *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975). "A strained construction may not be placed on the language used to find ambiguity where none exists." *Id.*

*Vanbebber v. Roach*, 252 S.W.3d 279, 284 (Tenn. Ct. App. 2007), *perm. app. denied* (Tenn. Mar. 3, 2008). It is well settled that "ambiguities in a contract are to be construed against the party drafting it." *Frank Rudy Heirs Assocs. v. Moore & Assocs., Inc.*, 919 S.W.2d 609, 613 (Tenn. Ct. App. 1995). In interpreting the language of a contract, we are required to use "the usual, natural, and ordinary meaning" of terms. *See Staubach Retail Servs.-Se., LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 526 (Tenn. 2005); *Adkins v. Blue Grass Estates,* 360 S.W.3d 404, 411 (Tenn. Ct. App. 2011). "The parol evidence rule does not permit contracting parties to 'use extraneous evidence to alter, vary, or qualify the plain meaning of an unambiguous written contract.'" *Staubach*, 160 S.W.3d at 525 (quoting *GRW Enters. v. Davis*, 797 S.W.2d 606, 610 (Tenn. Ct. App. 1990)).

A. Work Performed Outside Site Contract's Scope of Work

Regarding alleged discrepancies between the scope of work to be completed under the Site Contract and that to be completed under the Grading Subcontract, the trial court found in its written opinion in relevant part:

> The Court finds that the Site Contract, when considered with the extrinsic circumstances, creates a number of ambiguities. Principally, the site work commenced prior to any contract being signed. This fact is undisputed in the record and was recognized by Mr. Butler when he approved Pay Application No. 1 on February 9, 2011 in the amount of $265,667.37 for work performed through January 25, 2011. There is no language in the Site Contract that recognizes, reflects or adopts this fact. Article 3 of the Site Contract states in pertinent part:
>
> > The date of commencement of the Work shall be the date of this Agreement unless a different date is stated below or a provision is made for the date to be fixed in a notice to proceed issued by the Owner.
>
> No other date is fixed and no notice to proceed was issued by I&L.
>
> Secondly and perhaps most importantly with respect to Beacon4's claims, the terms "Work" and "scope of work" are not defined in the Site Contract or the "Contract Documents" that are referenced in the Site Contract. Page 1 of the Site Contract references "Land Development Work." This term is not defined, and the Project as "[a] new subdivision on 11.71 acres . . .," causing further confusion for the Court in interpreting this document.
>
> > Article 2 states:
> >
> > THE WORK OF THE CONTRACT
> >
> > The Contractor shall fully execute the Work described in the Contract Documents, except as specifically indicated in the Contract Documents to be the responsibility of others.
>
> Although the term "Work" is a capitalized term, it is not defined in the Site Contract. I&L relies heavily on AIA document A201-2007 "General

31

Conditions of the Contract for Construction" as governing certain of the parties' contractual disputes (the "General Conditions"). The General Conditions were introduced into evidence at the trial as Trial Exhibit No. 179. The General Conditions define the term "Work" in § 1.1.3 as follows:

> The term 'Work' means the construction and services required by the Contract Documents, whether completed or partially completed, includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. The Work may constitute the whole or a part of the Project.

This definition, however, does not help the Court in determining what items of work were originally intended "to fulfill the Contractor's obligations."

I&L contended rather strenuously throughout the trial of this case that the "scope of work" of Vic Davis, Beacon4's site subcontractor, was different from the "scope of work" of Beacon4 under the Site Contract. Although the "scope of work" is defined in Vic Davis' subcontract, the term is not defined in the Site Contract or in the General Conditions. The only reference to this term is in § 8.6 which states that "[f]or changes in the scope of work, the contractor's overhead and profit [fee] shall be established at 8% of the actual cost of the change (additive or deductive)." The term "scope of work" as repeatedly referred to by I&L is not a defined term under the Site Contract, thus, the Court cannot determine based on the evidence whether the "scope of work" under the two contracts actually differed. The Court finds, however, that it is not necessary to resolve this issue because, as the Court hereinafter explains, it has determined to decide this issue by the parties' conduct given the ambiguities in the Site Contract and the parties['] conduct that was inconsistent with the terms of the Site Contract.

I&L also relies on Exhibit E (Addendum Number Two) to the Site Contract as defining the scope of the grading work. Specifically, I&L relies on the following provisions of Exhibit E:

C-3 Site Grading Plan

Raise the building finished floor elevation 4 feet. Adjust all related site grades accordingly. Grade the site immediately

around the building per the new Revised Grading Plan dated February 3[rd] – attached hereto.

Although the parties did agree to raise the site 4 feet, I&L did not have a drawing prepared for Beacon4 or Vic Davis to determine what was meant by "[a]djust all related site grades accordingly." The Court finds this description deficient in defining an actual scope of work and, at best, ambiguous. Also, I&L and Mr. Butler elected not to retain the original civil engineer or any civil engineer to prepare new drawings after the parties agreed to raise the finished floor elevation 4 feet which the proof showed could have been accomplished for a cost of between $2,000.00 and $2,500.00. Instead, I&L elected to rely on the freehand drawing prepared by Mr. Butler. The reason the original civil engineer was not retained was because of a dispute Mr. Butler had with him. The Court, however, based on all the evidence including that of Steven Ellis, [Beacon4's] expert who testified at trial, finds that Mr. Butler's drawing was deficient in defining the original scope of the grade work as it related to raising the finished floor elevation by four (4) feet as well as the additional grade work beyond that scope created by the drawing itself. Mr. Ellis testified that Mr. Butler used a four (4) foot level and a six (6) inch iPhone to do the measurements for his freehand drawing. Mr. Davis testified that Mr. Butler used an architectural scale instead of an engineering scale on his freehand drawing. It is undisputed that Mr. Butler is not a civil engineer.

Based on all the evidence, the Court finds that the intent of the parties and the overriding objective before a dispute arose was to complete the Project (building and site) on a very compressed schedule in order for I&L to have its fireworks store open for business and selling fireworks to the public by Memorial Day 2011. This was accomplished. The Court finds . . . the economic benefit to I&L by the parties achieving this objective to be significant and substantial. Mr. Ingram testified that seventy percent (70%) of the company's fireworks stores' sales are made between Memorial Day and the Fourth of July. He also testified that it would have been "a devastating blow" to his company if the Blountville store was not opened by Memorial Day. I&L raised no material issue to Beacon4's performance and asserted no claims for liquidated damages, even though such a claim technically existed under the Site Contract. Again, this conduct is consistent with the parties' main goal of having the fireworks[] store open by Memorial Day. Given this objective and that the work actually started over a month before the Site Contract was signed, it is

understandable that certain of the parties' contractual arrangements would be left undefined or unaddressed.

This finding is supported by the testimony of most, if not all, of the witnesses. Mr. Davis testified that "this whole project was happening very, very fast." Mr. Russell testified it was a "fast track project[,"] that is, there was a very compressed schedule in which Beacon4 was to construct and deliver a building in a 3½ month period during the worst weather of the year. Mr. Butler also testified there was a compressed schedule and that Mr. Ingram was in a hurry to get the Project completed. As stated, Mr. Ingram testified that it would have been a devastating blow if the Blountville store was not open by Memorial Day 2011.

Given these factors, the Court further finds that the "scope of work" or what was considered "extra work" under the Site Contract is governed by the conduct of the parties when the work was requested to be performed and performed, and prior to a dispute developing. The Court finds that given the ambiguities in the Site Contract and the factors mentioned above, this is the best evidence of the parties' intent with respect to what work actually constituted changes in the original scope of work.

In addition, I&L's reliance on the General Conditions as governing the Change Orders or changes in the scope of work is misplaced. Article 7 of the General Conditions addresses "Changes In The Work." This article addresses two material "Changes in the Work[,"] "Change Orders" and "Construction Change Directives." There was no evidence of any Construction Change Directives, as the parties, Beacon4, I&L and Mr. Butler only used Change Orders. Section 7.2.1 of the General Conditions defines a "Change Order" as "a written instrument prepared by the Architect and signed by the Owner, Contractor and Architect stating their agreement upon all of the following: The change in the Work; The amount of the adjustment, if any, in the Contract Sum; and The extent of the adjustment, if any, in the Contract Time." Although there were numerous documents and e-mails passed back and forth between the parties for each Change Order request or Change Order, no document evidencing a Change Order contained the signatures of the three parties: I&L, Beacon4 and Mr. Butler. Mr. Butler simply never adhered to this protocol. Thus, the Court will determine the Change Orders in dispute based on the documents that were exchanged and the parties' conduct.

The Site Contract delineates the following list of "Land Development Work" included within the $795,486.00 contract price:

| | | |
|---|---|---|
| Cut/Fill/Grading | $ | 162,766.00 |
| Erosion Control | | 20,000.00 |
| Site Utilities | | 123,000.00 |
| Rock Excavation | | 110,000.00 |
| Box Culvert | | 92,000.00 |
| Gravel – Track 2 | | 33,250.00 |
| Termite Treatment | | 2,916.00 |
| Site Concrete | | 28,025.00 |
| Dumpster | | 2,500.00 |
| Flag Pole | | 11,520.00 |
| Site Electrical | | 47,648.00 |
| Mobilization | | 24,234.00 |
| Bldg. Pad Undercut | | 32,812.00 |
| General Conditions – OH/P | | 104,815.00 |
| | | |
| Total | $ | 795,486.00 |

As noted by the trial court, Addendum Two (or Exhibit E) to the Site Contract provides for a four-foot building floor elevation and adjustment of "all related site grades accordingly," as well as grading "the site immediately around the building per the new Revised Grading Plan," which was attached.

The trial court found that the contractual provision to adjust "all related site grades accordingly" was ambiguous in terms of exactly what grading adjustments were related to the four-foot floor elevation. Based on Mr. Ellis's expert testimony, Mr. Lingerfelt's testimony regarding the as-built survey he conducted, and the testimony of Mr. Davis and Mr. Russell, the trial court found that the adjustments extended beyond that anticipated by Addendum Two to the Site Contract. The court particularly focused on the effect of Mr. Butler's Revised Site Grading Plan, the drawing attached as part of Addendum Two, finding that the drawing failed to provide plans for all of the needed grading adjustments. We agree with the trial court that the provision to adjust "all related site grades accordingly" and the Revised Site Grading Plan were too ambiguous to provide Beacon4 with a basis upon which to anticipate all of the grading changes that would need to be made during completion of the FOA Project.

I & L argues that Beacon4 failed to call two witnesses, Mr. Carl and Mr. Gladney, who could have testified to Beacon4's understanding of the scope of grading work included in the Site Contract. Mr. Carl executed the Site Contract on behalf of Beacon4,

and Mr. Gladney (of Altera) acted as Beacon4's project director on the FOA Project. I & L argues that Beacon4's failure to call these two witnesses meets the criteria of Tennessee Pattern Jury Instruction T.P.I. 3-Civil 2.04 for presuming that Mr. Gladney's and Mr. Carl's testimonies would have been adverse to Beacon4. I & L appears to be asking this Court to apply the missing witness rule to this bench trial, which we determine to be inapplicable. *See, e.g., In re Estate of Hamilton*, No. M2009-01882-COA-R3-CV, 2011 WL 532296 at *6 (Tenn. Ct. App. Feb. 14, 2011), *perm. app. denied* (Tenn. May 25, 2011) ("[T]he missing witness and missing evidence rule applies to jury trials where the trial judge instructs the jury how to interpret the evidence or lack thereof, and [the appellant] does not explain how this rule can apply to a bench-tried case such as this.").[11] Furthermore, we note that although Mr. Russell testified that he was not convinced that Exhibit E and the Revised Site Grading Plan were attached to the Site Contract at the time Mr. Carl signed it, the trial court did not base its finding of ambiguity in the Site Contract on this testimony. The court considered, as do we, the Site Contract as it was executed, referencing Exhibit E and the Revised Site Grading Plan as attached and included.

The trial court credited the expert testimony of Mr. Ellis, the civil engineer who, at the request of Beacon4's counsel, rendered an opinion letter on July 21, 2014, upon his comparison of the original Benchmark design plans, Mr. Butler's Revised Site Grading Plan, and Mr. Lingerfelt's "as-built survey," as well as Mr. Ellis's review of Mr. Butler's deposition testimony. Because Mr. Ellis testified that he had not reviewed the Site Contract or Grading Subcontract, I & L maintains that Mr. Ellis's findings concerned only grading changes needed between the Benchmark plans and the addition of the Revised Site Grading Plan. Because the Revised Site Grading Plan was included in the Site Contract but not the Grading Subcontract, I & L asserts that Mr. Ellis's testimony indicated necessary grading changes outside the scope of work of the Grading Subcontract but not the Site Contract. According to I & L, the additional grading work testified to by Mr. Ellis, as well as by Mr. Davis and Mr. Russell, would be outside the scope of work of the Grading Subcontract only and therefore the basis of additional fees owed by Beacon4 to VDC but not by I & L to Beacon4.

---

[11] The missing witness rule provides:

"[A] party is entitled to argue, and have the jury instructed, that if the other party has it peculiarly within his power to produce a witness whose testimony would naturally be favorable to him, the failure to call that witness creates an adverse inference that the testimony would not favor his contentions."

*Newcomb v. Kohler*, 222 S.W.3d 368, 400 (Tenn. Ct. App. 2006) (quoting *State v. Middlebrooks,* 840 S.W.2d 317, 334 (Tenn. 1992), *superseded by statute on other grounds as explained in State v. Pruitt*, 415 S.W.3d 180, 209 (Tenn. 2013)).

36

The flaw in I & L's argument is that the trial court did not rely on Mr. Ellis for an interpretation of the Site Contract versus the Grading Subcontract. Instead, the trial court found that Mr. Ellis was examining the additional grading work required to complete the FOA Project beyond what was called for in Mr. Butler's Revised Grading Plan included in the Site Contract. Mr. Ellis in his opinion letter described the purpose of his review as follows:

> The purpose of my review is to render an opinion as to the additional grading performed as a result of the change from the original grading plan prepared by Benchmark Engineering to the grading plan prepared by Mr. Butler.
>
> The grading plan handdrawn by Mr. Butler was prepared to address the slope of the pavement within the handicap parking spaces and raising the building an additional four (4') feet in elevation. The grading plan prepared by Mr. Butler only addressed the areas of the building pad and the front parking lot.

Concerning what he found to be the additional grading quantities required to complete the FOA Project, Mr. Ellis explained his procedure and conclusions as follows in pertinent part:

> To assist in addressing the grading quantity issue, we have prepared some drawings that show a plan view of the site with various cross-section locations noted and drawings of the cross-sections of the site with respect to the original grading plan prepared by Benchmark Design, the grading plan prepared by Mr. Butler and the as-built grading of the site.
>
> The grading quantities were determined by converting the various drawings to a digital format and then triangulating the grading surfaces within a Civil Engineering software program in order to determine the grading quantities.
>
> It is very important to note that the grading plan prepared by Mr. Butler only addressed the building finished floor elevation and the immediate areas within the parking lot. There were no notes or revisions made to direct the contractor on how to handle the grading of the remainder of the site to work adequately with the new building finished floor and parking lot elevations. Therefore the contractor had to do additional grading to the detention basin to ensure that a retaining wall would not be needed and had to do additional grading on the eastern side of the building

37

in order to maintain an adequate flow path for storm water around the building. There were also grading modifications needed to connect the driveway for the building to the public roadway and provide for a smooth transition to the overflow parking area on the western side of the building. In addition, the contractor was asked to provide a driveway in the rear of the building by Mr. Butler which was not shown on the original plans.

Based upon my conversation with the contractor and our analysis of the grading plans and as-built survey, it appears that the contractor had to remove excess material from behind the building in order to provide the driveway behind the building as requested by Mr. Butler. The additional grading consisted of rock material that had to be hauled off-site. We estimate this grading quantity to be approximately 1,400 cubic yards. In order to grade the remainder of the site to the elevations required based upon the limited grading plan prepared by Mr. Butler, the contractor had to place approximately 2,000 cubic yards of additional material on the site.

Mr. Ellis's testimony at trial corroborated the conclusions expressed in his opinion letter, as did the respective testimonies of Mr. Davis regarding the grading work performed and Mr. Lingerfelt regarding the results of the as-built survey. We note that any site work required beyond the Revised Grading Plan would have been outside the scope of work of the Site Contract.

I & L also asserts that the trial court erred by relying on Mr. Davis's testimony regarding the scope of work of the Site Contract because Mr. Davis was a party to the Grading Subcontract but not the Site Contract. As with the credence given to Mr. Ellis's testimony by the trial court, we determine that the court credited Mr. Davis's testimony regarding the grading work needed over and above what Beacon4 and VDC could glean from the Revised Grading Plan. Therefore, the grading work considered by the trial court was outside the scope of work of the Site Contract, inclusive of the Revised Grading Plan.

Having found that the Site Contract was ambiguous as to the relevant scope of work, the trial court considered Beacon4's claims as to the disputed CORs as follows in relevant part:

In computing its damages, Beacon4 introduced two exhibits at trial, Trial Exhibit No. 78 and Exhibit No. 79. Exhibit No. 78 computes the amount Beacon4 claims is owing under the Site Contract. Exhibit No. 79 addressed the change orders or what Beacon4 referred to as the "Disputed Change Orders." Although I&L disputed owing the amounts listed on these

38

two exhibits, it did not contest the accuracy of the matters identified therein or that the two exhibits accurately summarized the disputed items. Therefore, the Court finds that Trial Exhibit Nos. 78 and 79 represent an accurate summary of Beacon4's damage claims and the Change Orders in dispute.

* * *

Exhibit No. 79 sets forth a total of twenty-four (24) Change Orders. Of this number, six (6) were paid as submitted and are not in dispute and one, S12A, was included in S3B and is not in dispute. This leaves seventeen (17) Change Orders in dispute and to be addressed by the Court.

Prior to addressing each disputed Change Order, the Court finds that the evidence at trial was undisputed that the work reflected in the Change Orders listed on [Beacon4's] Exhibit No. 79 was performed by Beacon4 or its subcontractors. In other words, I&L did not contest the performance of any of the additional work, the quality of any of the additional work or that I&L benefited from the additional work for which Beacon4 seeks compensation in this case. The question for the Court is whether Beacon4 is entitled to be paid for this work and, if it is, the amount of payment it is entitled to receive.

(Paragraph numbering and internal citations to record omitted.) The trial court then delineated the specific disputed CORs and analyzed each in detail, ultimately awarding to Beacon4 $103,447.29 of its claim for the disputed COs. The court summarized using the following table:

39

# Disputed Change Orders[12]

| Description | Amount Originally Claimed by Beacon4 | Amount Previously Approved by I&L | Amount Paid by I&L | Amount Awarded |
|---|---|---|---|---|
| S1 Fire Protection Vault | $ 10,459.40 | $ 5,459.40 | $ 5,459.40 | $ 5,000.00 |
| S2A Sanitary & Storm Sewer Mod. | $ 9,914.40 | $ 9,050.00 | $ 9,050.00 | $ 864.40 |
| S2B Additional Excavation | $ 33,270.20 | $ 3,600.00 | -0- | $ 33,270.20 |
| S2C Survey Adjustment | $ 1,258.00 | $ 900.00 | -0- | $ 1,100.00 |
| S3C Deduct Asphalt at TurnAround | $ 10,000.00 (Deduct) | $ 10,800.00 (Deduct) | $ 10,800.00 (Deduct) | $ 1,800.00 |
| S4 Electrical Services/BTES | $ 16,480.36 | $ 10,986.61 | $ 10,986.61 | $ 5,493.77 |
| S5 FP Vault – Electrical | $ 2,385.68 | $ 1,188.00 | $ 1,188.00 | $ 1,197.68 |
| S8 Water Line Extension | $ 1,781.00 | $ 1,707.48 | $ 1,707.48 | -0- |
| S9 Conduit for Future Light Poles | $ 2,114.65 | -0- | -0- | $ 2,067.82 |
| S12B Replace Stone at TurnAround | $ 36,634.68 | -0- | -0- | $ 36,634.68 |
| S12C Rear Drive Per Phil Lloyd | $ 4,598.90 | $ 2,829.60 | $ 2,829.60 | $ 1,769.30 |
| S12D Stonework at Checkout | $ 1,433.00 | $ 1,331.64 | $ 1,331.64 | -0- |
| S12E Stonework – Re-rock Lot 2 | $ 1,730.00 (Deduct) | $ 2,084.00 (Deduct) | $ 2,084.00 (Deduct) | $ 308.80 |
| S12G Stonework – Rip/Rap at Rear | $ 4,220.64 | -0- | -0- | $ 4,220.64 |
| S13 Seeding | $ 11,211.48 | $ 8,100.00 | -0- | $ 9,720.00 |
| **TOTAL CHANGE ORDERS** | $143,763.49 | $ 47,236.73 | **$ 32,552.73** | **$103,447.29** |

[12] The trial court noted credits to I & L against the amount owed as deductions (or "Deduct"). For instance, Beacon4 initially submitted CO S3C, Asphalt Paving, as a deduction of $10,000.00 because I & L had agreed to eliminate a turn-around (or cul-de-sac) originally included in the Benchmark plans. The $1,800.00 award for this item represents $1,000.00 originally deducted in acknowledged error by Mr. Butler (but not yet paid to Beacon4) and $800.00 to Beacon4 as its eight-percent overhead and profit fee provided in the Site Contract.

The trial court thus found that I & L owed Beacon4 a "contract sum" in the amount of $150,390.04, comprised of the total COs awarded in the amount of $103,447.29 plus the undisputed retainage of $46,942.75. The court further found that I & L had breached the Site Contract by failing to pay Beacon4 the contract sum as of October 17, 2011, the date that the paving subcontractor received payment for completion of what the court found to be the final item of work required under the Site Contract.

The trial court also made detailed findings concerning each disputed CO. As a representative example, we include here the trial court's specific findings regarding a major portion of the additional grading work, Change Order S2B, Additional Excavation, upon which the court awarded to Beacon4 $33,270.20. Specifically regarding this COR, the trial court found:

> Mr. Russell and Mr. Davis testified in detail regarding this Change Order. It was also addressed by the expert testimony of Mr. Ellis. Mr. Davis testified that he, along with representatives of Beacon4, had a meeting with Mr. Butler at the Blountville Arby's on April 20, 2011. One of the topics at the meeting was the additional grading and excavation work that was caused by Mr. Butler's freehand drawing that was required to finish the site. The freehand drawing was prepared by Mr. Butler and presented to Vic Davis on February 8, 2011. Mr. Davis proposed to have an as-built survey prepared to reflect the additional grading work that was required to finish the site after raising it four (4) feet and that Vic Davis would charge the original base prices for which it originally agreed to do the work. Mr. Davis testified that this was a reasonable, objective basis to measure the changes. He also testified that Mr. Butler told him at the meeting that "his owners were fair people and that he would present it to them and if they realized their property had been improved by these changes that he [Butler] felt certain they would be willing to pay for the changes."

> Mr. Butler later recognized that the additional grade work was changed in the scope of work in the Site Contract and approved a change for S2B of $4,500.00. In an e-mail authored by Mr. Butler dated April 25, 2011 re: Dirt Work, he stated in part as follows:

>> . . . $900.00 additional survey work . . . $3,600.00 – 300 CY of new fill work for north parking lot for ADA regrading . . . so for this Change Order I can support $3,600 of added fill work and the $900.00 that Tim Lingerfelt told me that he charged Vic [Davis]. $4,500.00 OH&P.

Mr. Lingerfelt testified that the $900.00 represented the Change Order request that he submitted to Vic Davis for the additional survey work caused by Mr. Butler's freehand drawing. At trial, Mr. Butler testified that "the approval of the $4,500.00 was later rescinded by him" when he realized, after Mr. Taylor sent his November 15, 2011 demand letter, that this additional grade work was part of the original Site Contract. The Court rejects this contention and finds that I&L is bound by Mr. Butler's initial determination at the time the issue was addressed that there was additional grading work required beyond that shown in the original drawings and after the site was raised four (4) feet created in part by Mr. Butler's freehand drawing. The Court also finds Mr. Butler's testimony that he did not realize that he had made an error in approving the additional excavation as extra work until late November 2011 not to be credible. This additional grade work was created by Mr. Butler's freehand drawing and other changes to the site such as the road behind the building as well as the blending of the site once these and other changes are taken into consideration. The question for the Court is what is a reasonable amount, if any, for which Beacon4 should be compensated for the additional grade work?

The Court finds Mr. Davis' testimony that the parties agreed on an as-built survey as a reasonable means to provide an objective picture of the additional grade work to be credible. In fact, Mr. Butler did not, in his testimony, dispute that such an agreement was reached. Mr. Lingerfelt testified that he prepared a topographical survey dated June 27, 2011. This survey compared the finished site to the change in the grade from the original site plus the four (4) feet change in elevation.

Mr. Davis testified that Vic Davis took the digital information provided by Mr. Lingerfelt's topographical survey and imputed that data into a computer program which was designed to extrapolate the added excavation work between the original plan elevation of 1634 plus four (4) feet and the as-built survey. The added excavation work was reflected on Vic Davis' invoice of July 22, 2011 and accompanying data. The line item for the added excavation work states:

Added Excavation:
Export: 1380 cy X 11.18 = $15,428
Cut and Fill Onsite: 4744 cy X $4.02 = $19,070

42

This invoice also included the charge for the survey changes for the new elevation of $1,058.00; the charge of $2,500.00 for as-built survey; rock excavation – 12.25 hours X $300.00 = $3,675.00; overhead of $395.00; and profit of $439.00, for a total of $42,565.00. The amount that was passed on to the owner by Beacon4 in Change Order S2B is $33,270.20.

Beacon4's position that Mr. Butler's freehand drawing and other changes to the site created additional excavation work was supported by the expert testimony of Steven Ellis, a civil engineer. Mr. Ellis prepared a drawing that compared the original site, the Benchmark Plans, Mr. Butler's freehand drawing, and the as-built survey prepared by Mr. Lingerfelt. Mr. Ellis designated to the Court, with his drawing the areas between Mr. Butler's freehand grading plan and the as-built survey which represented the added excavation work. This analysis, along with the other testimony on this topic persuades the Court that Beacon4 has met its burden of proof that Mr. Butler's freehand drawing along with the other site changes such as the construction of the road behind the building created additional grading and excavation work beyond the scope of the original grading plans after adding the four (4) feet change in elevation for the finished floor. The Court further finds that the sum of $33,270.20 is a reasonable charge for this additional work. Mr. Butler previously approved $3,600.00 for this work which was not paid by I&L. Accordingly, the Court awards Beacon4 the sum of $33,270.20 on Change Order S2B. This amount includes the $3,600.00 previously approved by I&L.

(Paragraph numbering and internal citations to record omitted.)

We conclude that the evidence preponderates in favor of the trial court's findings regarding the amount owed by I & L to Beacon4 for work performed outside the scope of the Site Contract. *See Buttrey v. Holloway's, Inc.*, No. M2011-01335-COA-R3-CV, 2012 WL 6451802 at *7 (explaining that it is the plaintiff's burden in a breach of contract action to prove damages by a preponderance of the evidence) (citing *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011)); *BancorpSouth Bank v. Hatchel*, 223 S.W.3d 223, 229 (Tenn. Ct. App. 2006)). We emphasize that the trial court's findings regarding witness credibility are entitled to great weight on appeal. *See Jones,* 92 S.W.3d at 838. Although not all of the disputed COs upon which the trial court awarded amounts to Beacon4 concerned site grading, I & L's argument regarding the scope of work focuses solely on what the court found to be additional grading work outside the scope of the Site Contract. We have therefore confined our analysis here to the change in the scope of work caused by the additional grading. Having also reviewed the record in light of all of the disputed COs, we further conclude that the evidence does not preponderate

against the trial court's findings regarding the amounts due under the remaining COs as well.

## B. Timeliness of Beacon4's COR Claims

I & L asserts that the trial court erred by declining to find that Beacon4's claims concerning nine of the disputed CORs were barred due to untimeliness under the provisions of the Site Contract. Beacon4 maintains that the trial court properly found that Beacon4's claims concerning the disputed CORs were not time-barred because if Mr. Butler's decisions to deny certain CORs were "final" decisions, pursuant to the Site Contract, those claims were still subject to mediation and litigation. Upon our thorough review, we conclude that the evidence does not preponderate against the trial court's finding that Beacon4's claims concerning the disputed CORs were not time-barred.

In support of its argument, I & L relies on § 15.1.2 of the General Conditions, entitled "Notice of Claims" within a larger section entitled "Claims," which is in turn within Article 15, entitled "Claims and Disputes." Subsection 15.1.2 provides:

> Claims by either the Owner or Contractor must be initiated by written notice to the other party and to the Initial Decision Maker with a copy sent to the Architect, if the Architect is not serving as the Initial Decision Maker. Claims by either party must be initiated within 21 days after occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes the condition giving rise to the Claim, whichever is later.

It is undisputed that throughout the pendency of the FOA Project, Mr. Butler acted as the "Initial Decision Maker." Subsection 15.1.1 of the General Conditions defines a "Claim" as follows:

> A Claim is a demand or assertion by one of the parties seeking, as a matter of right, payment of money, or other relief with respect to the terms of the Contract. The term "Claim" also includes other disputes and matters in question between the Owner and Contractor arising out of or relating to the Contract. The responsibility to substantiate Claims shall rest with the party making the Claim.

The Site Contract provides for dispute resolution as follows:

> The Owner and Contractor agree that in the event any dispute, disagreement, or problem arising under this agreement between the parties

44

cannot be expeditiously resolved through normal course of communication, it shall be promptly reduced to writing in letter form by the complaining party outlining respective parties['] understanding of the dispute, disagreement or problem and position in regard to the same together with a request for mediation; the letter shall then be delivered to the other party. Thereafter, unless otherwise agreed to in writing, each party shall meet and confer at least once within fifteen working days of receipt of the letter and attempt to resolve the dispute, disagreement or problem in good faith. Use of this procedure shall be a condition precedent to the institution of litigation or other legal proceeding.

If the parties do not resolve their dispute through mediation pursuant to the above, the method of binding dispute resolution shall be through litigation in a court of competent jurisdiction.

Article § 8.1 of the Site Contract further provides that references in the Site Contract to a provision of the General Conditions "refers to that provision as amended or supplemented by other provisions of the Contract Documents."

On October 17, 2011, Mr. Russell, writing on behalf of Beacon4, sent to Mr. Ingram and Mr. Lloyd a letter with the subject heading, "FOAB – Site Contract[;] Dispute Resolution – Notice of Claim," stating the following in pertinent part:

We have completed all work related to the Site Contract and received multiple payments for our work. The Original Contract was altered by the Architect during the course of construction with twenty-four (24) separate issues as detailed on the attachments.

- On eight (8) issues, the Architect funded the issues as Beacon4 submitted.
- On sixteen (16) issues, the Architect under-funded the Beacon4 submitted cost, a total of $91,623.34.
- On 10/12/11, the Architect provided a partial A201 document that had previously not been provided. This A201 is referred to in Paragraph 9.1.2 of the Contract, but has never been provided in complete form, however, part of this document was first provided on 10/12/11. The paragraphs provided at that time detailed the terms and time-line for dispute resolution.[13]

---

[13] Mr. Russell testified that Beacon4 had assumed that the "AIA Document A201™-2007 General Conditions of the Contract for Construction" was essentially the same as a 1997 version he had operated

After reviewing the A201 paragraphs provided, there are seven (7) Change Orders that still can be mediated in accordance with this new document. Per Paragraph 6.1 of the Contract, the Architect served as the *Initial Decision Maker* in evaluating the payment amounts allowed on each Change Order. We have had, and continue to have, disagreements with the *Initial Decision Maker's* evaluation. We are requesting mediation on seven (7) Change Orders, identified as CO – SITE 5, detailed on the attachments.

\* \* \*

Please accept this letter as formal Notice of Claim from Beacon4, that we are requesting mediation on the seven (7) Change Orders detailed in the attachments. If the Owner is willing, we are also request [sic] consideration on the nine (9) additional Change Orders that fall outside the time limitation provided for in the A201 document.

In an electronic mail message dated October 22, 2011, Mr. Butler responded to Mr. Russell on behalf of I & L, stating that, *inter alia*, the time had lapsed for Beacon4 to request mediation on all except the seven CORs attached to Mr. Russell's October 17, 2011 letter. Mr. Butler wrote in relevant part:

The architect's interim determination of cost shall adjust the contract sum on the same basis as a change order subject to the right of either party to disagree and assert a claim in accordance with article 15. So as you can see once we issued a change order or any request for change order the clock starts running and you have 21 days to dispute that said decision and request medication [sic] on that matter. Here are the dates of the change orders which represents the final decision by me on your requests. Change order number 1, March 10, 2011, change order two, May 1, 2011, change order three, May 3rd, 2011, change order four, June 21, 2011, change order five, September 30, 2011, any and all items covered in CO #1-4 have become final decisions due to your failure to dispute the decision and request mediation. Only items CO #% [sic] can be medicated [sic].

under with contracts in the past. According to Mr. Russell, he was surprised by the architect's exclusive role as "Initial Decision Maker" for any type of claim in the 2007 version. We agree with I & L, however, that as a document produced by the American Institute of Architects, the 2007 version of the AIA Document was available to Beacon4 and that Beacon4 was obliged to consider the version named in the Site Contract as the version incorporated into the parties' contract. Beacon4 has not argued otherwise on appeal.

I & L relies, as did Mr. Butler, on the twenty-one day provision in the General Conditions § 15.1.2. regarding "claims" to assert that Beacon4's disputed CORs originally submitted prior to October 17, 2011, were time-barred. I & L also insists that Beacon4 waived its right to pursue these CORs through Mr. Russell's acknowledgment in his October 17, 2011 letter that, as he read § 15.1.2 of the General Conditions, the time period for mediating prior claims had passed. We disagree.

Regarding the timeliness of Beacon4's disputed COR claims, the trial court stated in its written opinion in pertinent part:

> Beacon4 sent a letter to I&L on October 17, 2011 requesting mediation of the outstanding or disputed Change Orders. Mr. Butler responded to this request by e-mail dated October 22, 2011 and refused mediation on all the disputed Change Orders except those listed in the Architect's Change Order No. 5. A meeting was held where these items were discussed, but no resolution was reached.

> Beacon4, thereafter, retained counsel, David K. Taylor, and he sent an initial demand letter to I&L and Mr. Butler dated November 15, 2011. Mr. Butler responded to this letter on November 23, 2011. Mr. Taylor responded to Mr. Butler's November 23, 2011 letter by letter dated December 6, 2011. Mr. Taylor's December 6, 2011 letter states . . . that ". . . because of the costs and expenses of litigating any construction dispute, I have advised Beacon4 to suggest to I&L that they agree to participate in a formal mediation, to take place in Tennessee, and with a mutually agreeable experienced Tennessee mediator who is also a construction lawyer. I am sure the Owner's counsel can recommend someone appropriate." Based on Mr. Butler's testimony and despite Mr. Taylor's invitation, I&L did not agree to a mediation.

> The Court finds that the mediation contingency contained in § 6.2 of the Site Contract to institute a civil action was satisfied by Beacon4's letter of October 17, 2011 and Mr. Taylor's correspondence of December 6, 2011.

> I&L contends that Beacon4 is precluded or barred from proceeding with the Change Order claims not related to the Architect's Change Order No. 5 because Beacon4 did not timely assert those claims. Mr. Butler asserted this position on behalf of I&L in an e-mail dated October 22, 2011. Specifically, Mr. Butler cited § 15.1.2 of the General Conditions which state in pertinent part that " . . . [c]laims by either party must be initiated

47

within 21 days after occurrence of the event giving rise to such Claim or 21 days after the claimant recognizes the condition giving rise to the Claim, whichever is later."

Mr. Butler was also the "Initial Decision Maker" under the Site Contract. Mr. Butler stated in his e-mail of October 22, 2011 that "[a]ny and all items covered in CO #1-4 have become final decisions due to your failure to dispute the decision and request mediation. Only items CO #% [sic] can be medicated [sic]."

But, § 15.2.5 of the General Conditions states that:

. . . [t]he initial decision shall be final and binding on the parties but subject to mediation and, if the parties fail to resolve their dispute through mediation, to binding dispute resolution.

The Court, therefore, finds that, even if the Architect's decision on the Beacon4 Change Order requests listed in the Architect's Change Orders 1-4 was a final decision, such claims were still subject to mediation and litigation in a court of competent jurisdiction if the mediation was unsuccessful.

Thus, I&L's claim or assertion that Beacon4 is barred to pursue any of the Change Order Requests in this case is rejected.

The trial court thus found that even if Mr. Butler's decisions on the disputed CORs were "initial" decisions that became "final," such "final" decisions were still subject to mediation and, if mediation were unsuccessful, litigation, pursuant to § 15.2.5 of the General Conditions. We agree with the trial court that § 15.2 of the General Conditions, entitled "INITIAL DECISION," governs requests for mediation of initial decisions unless amended or supplemented by the Site Contract.

Subsection § 15.2.5 of the General Conditions provides:

§ 15.2.5 The Initial Decision Maker will render an initial decision approving or rejecting the Claim, or indicating that the Initial Decision Maker is unable to resolve the Claim. This initial decision shall (1) be in writing; (2) state the reasons therefor; and (3) notify the parties and the Architect, if the Architect is not serving as the Initial Decision Maker, of any change in the Contract Sum or Contract Time or both. The initial decision shall be final and binding on the parties but subject to mediation

48

and, if the parties fail to resolve their dispute through mediation, to binding dispute resolution.

Section 15.2 of the General Conditions further provides in relevant part:

§ 15.2.6  Either party may file for mediation of an initial decision at any time, subject to the terms of Section 15.2.6.1.

§ 15.2.6.1  Either party may, within 30 days from the date of an initial decision, demand in writing that the other party file for mediation within 60 days of the initial decision.  If such a demand is made and the party receiving the demand fails to file for mediation within the time required, then both parties waive their rights to mediate or pursue binding dispute resolution proceedings with respect to the initial decision.

Pursuant to § 15.2.6.1, the parties waive their respective rights to mediate a binding dispute resolution concerning an initial decision if one party has, within thirty days of an initial decision, demanded that the other party file for mediation within an additional thirty days and the second party fails to do so.  The provision, however, employs the discretionary auxiliary verb, "may," and therefore does not require that a party wishing to mediate an initial decision demand such mediation within thirty days.  *See, e.g., Bellamy v. Cracker Barrel Old Country Store, Inc.,* 302 S.W.3d 278, 281 (Tenn. 2009) (explaining that in contrast to the use of "may," "'[w]hen 'shall' is used . . . it is ordinarily construed as being mandatory and not discretionary.'") (quoting *Stubbs v. State,* 393 S.W.2d 150, 154 (Tenn. 1965)).  Moreover, as the trial court found, even if Mr. Butler's initial decisions on the disputed CORs became "final decisions," the Site Contract still provided a procedure for mediation of disputes as a condition precedent to litigation.

In contrast to an initial decision, a "Claim" as defined in § 15.1.1 of the General Conditions is "a demand or assertion by one of the parties seeking, as a matter of right, payment of money, or other relief with respect to the terms of the Contract."  A claim under the General Conditions is not, therefore, simply a request to review an initial decision regarding a COR but would instead apply to a demand for payment or relief, which is exactly what Beacon4 was seeking when Mr. Russell submitted a "Notice of Claim" on October 17, 2011.  We are not persuaded by I & L's intimation that Mr. Russell's attempt to interpret provisions of the General Conditions attached to a message

previously sent by Mr. Butler constituted a waiver of Beacon4's right to give notice of its claim. I & L is not entitled to relief on this issue.[14]

## VII. Prompt Pay Act of 1991

I & L also contends that the trial court erred by finding that I & L had violated the PPA, *see* Tenn. Code Ann. §§ 66-34-101 to -602 (2015), and had done so in bad faith, thereby entitling Beacon4 to attorney's fees and out-of-pocket expenses, *see* Tenn. Code Ann. § 66-34-602(b) (2015). I & L first argues that Beacon4 is barred from recovery under the PPA because Beacon4 violated the TCLA. Having determined in a prior section of this Opinion that the trial court did not err by declining to find that Beacon4 had violated the TCLA, we further determine that I & L's argument in this regard is pretermitted as moot. I & L next argues that it did not violate the PPA because it lawfully withheld a retainage of $46,942.75 for the statutorily allowed ninety-day period following substantial completion of work under the Site Contract and because the disputed CORs were submitted for work outside the Site Contract's scope.

Beacon4 contends that the trial court properly found that I & L violated the PPA by failing to timely release the retainage as required by Tennessee Code Annotated § 66-34-103(b). Beacon4 also asserts that the trial court erred by declining to assess against I & L the statutory penalty of $3,000.00 per day provided by Tennessee Code Annotated § 66-34-103(e) upon finding that said penalty was not available as a civil remedy. Upon our careful review of the record and applicable authorities, we discern no reversible error in the trial court's application of the PPA.

Tennessee Code Annotated § 66-34-201 (2015) provides: "Performance by a contractor in accordance with a written contract with an owner for improvement of real property shall entitle such contractor to payment from the owner." Tennessee Code Annotated § 66-34-103 (2015) further provides in pertinent part:

> (a)   All construction contracts on any project in this state, both public and private, may provide for the withholding of retainage; provided,

---

[14] We recognize that Beacon4 raised an issue in the trial court of whether I & L had waived adherence to the provisions of the General Conditions through failure to strictly follow the provisions in reviewing CORs. I & L responded by arguing to the trial court that Beacon4 had failed to plead waiver. At the close of trial, the court granted Beacon4's Rule 15.02 motion to amend its pleadings to include waiver, although in so doing, Beacon4 acknowledged that waiver is an affirmative defense rather than a cause of action. *See Madden Phillips*, 315 S.W.3d at 813. Having determined that the trial court correctly based its findings regarding the timeliness of Beacon4's claims upon the "Claims" section of the General Conditions as well as the Site Contract, we further determine that any defense considering waiver of the General Conditions in this regard is pretermitted as moot.

however, that the retainage amount may not exceed five percent (5%) of the amount of the contract.

(b)     The owner, whether public or private, shall release and pay all retainages for work completed pursuant to the terms of any contract to the prime contractor within ninety (90) days after completion of the work or within ninety (90) days after substantial completion of the project for work completed, whichever occurs first. As used in this subsection (b), work completed shall be construed to mean the completion of the scope of the work and all terms and conditions covered by the contract under which the retainage is being held.

\* \* \*

(c)     Any default in the making of the payments shall be subject to those remedies provided in this part.

Tennessee Code Annotated § 66-34-104(a) (2015) provides that when an owner retains a portion of the contract price, "that retained amount shall be deposited in a separate, interest-bearing, escrow account with a third party which must be established upon the withholding of any retainage."[15] *See also* Tenn. Code Ann. § 66-34-104(b)-(k) (2015) (setting forth requirements, *inter alia*, for the management of said escrow account and payment to the contractor upon satisfactory completion of the contract).

Regarding when an owner must remit a retainage to a contractor, Tennessee Code Annotated § 66-34-204 (2015) provides:

When an owner:

(1)     Has received a use and/or occupancy permit for an improvement from a governmental agency lawfully issuing such permit;

(2)     Has received a certificate of substantial completion from an architect charged with supervision of the construction of an improvement; or

---

[15] The final clause, "which must be established upon the withholding of any retainage," was added by the General Assembly in an amendment effective July 1, 2012, subsequent to the commencement of the instant action. See 2012 Pub. Acts., Ch. 609 § 2 (H.B. 2764). No issue has been raised in this case regarding I & L's compliance with the requirement to keep the retainage in an interest-bearing escrow account with a third party.

(3) Begins to use or could have begun to use an improvement; the owner shall, after any such event and pursuant to the terms of the written contract, pay to the contractor all retainage the owner may have withheld pursuant to the written contract, except any sum which the owner may reasonably withhold in accordance with the written contract between the owner and the contractor; provided, however, that the retainage must be paid within ninety (90) days after the date of the occurrence of an event included in subdivision (1), (2) or (3).

A. I & L's Failure to Pay Retainage within Statutory Deadline

It is undisputed that the Sullivan County Building Commissioner issued a certificate of occupancy on May 17, 2011, which allowed the FOA store to be open for business prior to the 2011 Memorial Day weekend. The trial court found that I & L violated the PPA by failing to pay the retainage it had withheld from Beacon4 within the statutory time frame of ninety days following the issuance of the certificate of occupancy and I & L's use of the FOA site as a store open to the public. *See* Tenn. Code Ann. § 66-34-204(1), (3). In its written opinion, the court stated the following specific findings in relevant part:

> The Court concludes that Beacon4 performed in accordance with the terms of the Site Contract and, pursuant to T.C.A. § 66-34-201, is entitled to be paid by I&L, the owner. I&L's Certificate of Occupancy was issued on May 17, 2011. Therefore, based on T.C.A. § 66-34-204(3) and T.C.A. § 66-34-103(b), the Court concludes that I&L was required to pay the retainage within ninety (90) days after that date or by August 17, 2011. I&L failed to do so.

> I&L contends that it had the right to withhold the retainage pursuant to the General Conditions. The Court finds this position inconsistent with I&L's voluntary tender of the funds it claimed [were] owing pursuant to I&L's letter of April 5, 2012. Nevertheless, the Court concludes that T.C.A. § 66-34-204(3) makes it clear that withholding the retainage beyond the ninety (90) days after the certificate of occupancy was issued is not permitted, regardless of the parties' contractual provisions or rights. The statute is clear that "the retainage must be paid."

> Beacon4 put I&L on notice of its *Prompt Pay Act* claims by letters of its counsel dated November 15, 2011 and December 6, 2011. The

November 15, 2011 letter was sent by certified mail, return receipt requested in compliance with T.C.A. § 66-34-602[a](2).[16]

By failing to pay the retainage within the ninety (90) day period of substantial completion as required by T.C.A. § 66-34-204(3), I&L violated the terms of the *Prompt Pay Act* entitling Beacon4 the right to recover the remedies provided for therein.

(Paragraph numbering and internal citations to record omitted.) We note that the ninety-day period following May 17, 2011, actually concluded on August 15, 2011.

I & L argues that upon the trial court's finding that the Site Contract was separate from the Building Contract, the court erred by considering the certificate of occupancy as indicative of the Site Contract's completion. I & L made a final payment to Beacon4 on the Building Contract, inclusive of the retainage withheld on that contract, on September 8, 2011. Beacon4 has made no claims under the Building Contract. The trial court found, however, that because I & L was able to open the FOA store and use the site for public access to the store in May 2011, pursuant to the certificate of occupancy, such use constituted I & L's use of the improvement contracted for in the Site Contract. *See* Tenn. Code Ann. § 66-34-204(3) (providing that the ninety-day period within which payment of the retainage is required is triggered when the owner "[b]egins to use or could have begun to use an improvement . . . .").

In response, Beacon4 argues that the Site Contract was substantially completed on May 17, 2011, particularly to the extent that the Sullivan County Building Commissioner certified the FOA site as safe for the public to enter and utilize. The Building Contract and the Site Contract each respectively included a provision that "[t]he Contractor shall achieve Substantial Completion of the entire Work not later than May 10th, 2011." As Beacon4 points out, I & L was entitled under the Site Contract to assess $1,000 daily in liquidated damages "[f]or every day after May tenth and until May 25th that the contractor delivers the approval of the land development work by the City/County" and

---

[16] Tennessee Code Annotated § 66-34-602(a) provides in relevant part:

    (a)(1)    A contractor who has not received payment from an owner, or a subcontractor, materialman or furnisher who has not received payment from a contractor or other subcontractor, materialman or furnisher, in accordance with this chapter, shall notify the party failing to make payment of the provisions of this chapter and of the notifying party's intent to seek relief provided for within this chapter.

    (2)    The notification shall be made by registered or certified mail, return receipt requested.

I & L does not dispute that Beacon4 properly provided notice of its claim under the Prompt Pay Act.

$10,000.00 daily in liquidated damages after May 10, 2011. Mr. Butler acknowledged that I & L had waived any pursuit of such liquidated damages. Although some site work continued through the summer of 2011, the evidence does not preponderate against the trial court's finding that I & L was able to use the site for public access to the FOA store as of May 17, 2011.

Whether this use constituted substantial completion under the Site Contract is a question of fact that we find unnecessary to resolve because the evidence does not preponderate against the trial court's finding that the Site Contract was entirely completed by the time that I & L issued a joint payment to Pave-Well and Beacon4 on October 17, 2011, for laying the top coat of asphalt in early September 2011. Assuming, *arguendo*, that substantial completion of the Site Contract did not occur until October 17, 2011, the date as of which the trial court found I & L in breach of contract, the ninety-day statutory period under the PPA would have ended on January 15, 2012. *See* Tenn. Code Ann. § 66-34-204(3). I & L did not offer to tender any part of the retainage until issuing its April 5, 2012 letter offering "final payment" in the form of a joint check made out to Beacon4 and VDC in the amount of $62,297.00 on the condition that Beacon4 and Mr. Davis execute what I & L termed "the appropriate lien release." Inasmuch as I & L undisputedly had not released the retainage to Beacon4 by January 15, 2012, we determine that the trial court did not err by finding that I & L violated the PPA pursuant to Tennessee Code Annotated §§ 66-34-103(b), -204(3).

I & L argues on appeal that "there was no proof at trial of when the Site Contract was completed." We disagree. The trial court found Mr. Davis's testimony credible that by August 30, 2011, VDC had finished a "punch list" of corrective site work identified by Mr. Butler as necessary for final completion of the project. Undisputed testimony indicated that the parties had agreed to wait until Labor Day weekend to have Pave-Well lay the final topcoat of asphalt. Upon receipt of Mr. Taylor's November 15, 2011 letter demanding final payment to Beacon4, Mr. Butler responded via letter on November 23, 2011, delineating purported deficiencies in the site work that Mr. Butler asserted would have to be corrected before the retainage would be released.

In a letter dated December 6, 2011, Mr. Taylor set forth Beacon4's response to each alleged deficiency, indicating Beacon4's response that only two, removal of silt fencing and installation of "rip rap" (loose stone) at the inlet to the northeast corner detention basin, were outstanding items. According to Mr. Taylor's letter, Mr. Davis had been notified to remove the silt fencing, and Beacon4 was offering a $250.00 credit for the missing rip rap. Although Mr. Butler continued to maintain that deficiencies remained, he acknowledged at trial that he had at no time reduced the alleged deficiencies to monetary values. Similarly, Mr. Ingram acknowledged that I & L had no outstanding claims against Beacon4 for incomplete work under the Site Contract.

54

Finally, I & L relies on section 9.10.2 of the General Conditions to assert that Beacon4 failed to satisfy contractual preconditions for release of the retainage. Section 9.10.2 provides:

> Neither final payment nor any remaining retained percentage shall become due until the Contractor submits to the Architect (1) an affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which the Owner or the Owner's property might be responsible or encumbered (less amounts withheld by Owner) have been paid or otherwise satisfied, (2) a certificate evidencing that insurance required by the Contract Documents to remain in force after final payment is currently in effect and will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner, (3) a written statement that the Contractor knows of no substantial reason that the insurance will not be renewable to cover the period required by the Contract Documents, (4) consent of surety, if any, to final payment and (5), if required by the Owner, other data establishing payment or satisfaction of obligations, such as receipts, releases and waivers of liens, claims, security interests or encumbrances arising out of the Contract, to the extent and in such form as may be designated by the Owner. If a Subcontractor refuses to furnish a release or waiver required by the Owner, the Contractor may furnish a bond satisfactory to the Owner to indemnify the Owner against such lien. If such lien remains unsatisfied after payments are made, the Contractor shall refund to the Owner all money that the Owner may be compelled to pay in discharging such lien, including all costs and reasonable attorneys' fees.

When questioned regarding whether he had completed an affidavit such as the one provided for in the General Conditions § 9.10.2, Mr. Russell stated that he did not know whether he had.[17] Despite this alleged omission, I & L offered on April 5, 2012, to tender a "final payment," consisting of a check made out jointly to Beacon4 and VDC in the amount of $62,297.00, provided that a Beacon4 representative and Mr. Davis arrive together at I & L's counsel's office and "sign the appropriate lien release." On appeal, I & L insists that Beacon4's refusal to sign an "appropriate lien release" was a violation of the General Conditions that bars Beacon4's claim under the PPA. The trial court found, however, that the lien release demanded by I & L in return for the $62,297.00 check was

---

[17] I & L does not refute Mr. Russell's testimony that VDC was the only subcontractor to which I & L owed outstanding funds following the final payment to Pave-Well in October 2011. Mr. Davis testified that each time I & L paid Beacon4 for work completed by VDC, Beacon4 remitted payment to VDC in accordance with the Grading Subcontract.

a final lien release that would have required Beacon4 to waive its right to pursue payment for the disputed CORs. As the trial court explained in its written opinion:

> There is a dispute in the testimony as to what was meant by the term "appropriate release." Mr. Russell testified that he was told that a final release would be required. Mr. Butler's deposition testimony was similar to that of Mr. Russell's trial testimony, although Mr. Butler attempted to "back up" from his prior testimony at trial. The Court finds that I&L, in consideration of the payment of $62,297.00, would have required that both Beacon4 and Vic Davis sign a final lien release. Any conclusion to the contrary makes no sense in light of I&L's making the check jointly payable to Beacon4 and Vic Davis when the Site Contract was with Beacon4, and the language in Mr. Ingram's letter, that "[t]he check is for the balance due on your contracts," and upon signing the appropriate lien release, "we [I&L] consider the contracts completed." Mr. Butler's explanation that something other than a final lien release was meant with the words "appropriate release" is not accepted by the Court.

We determine that the evidence does not preponderate against the trial court's finding that I & L's April 2012 offer to release the retainage to Beacon4 was predicated upon the condition of a final lien release that would have deprived Beacon4 of its right to pursue funds it was owed for work completed outside the scope of the Site Contract. Moreover, as the trial court properly found, the PPA requires that a retainage be paid to the contractor within ninety days of substantial completion of the work or the owner's beginning to use the improvement contracted for regardless of any contractual provisions allowing the owner to reasonably withhold a sum. *See* Tenn. Code Ann. § 66-34-204(3). We note also that even considering the October 17, 2011 date for substantial completion of the Site Contract, the ninety-day statutory period for mandatory release of the retainage ended three months prior to I & L's offer to release the retainage in return for Beacon4's release of its lien claim. *See id.* The trial court did not err by finding I & L in violation of the PPA.

### B. Beacon4's Claim for Attorney's Fees and Out-of-Pocket Expenses

#### 1. Bad Faith

I & L asserts that the trial court abused its discretion by finding that I & L's violation of the PPA was in bad faith and thereby awarding to Beacon4 attorney's fees and out-of-pocket expenses. Tennessee Code Annotated § 66-34-602(b) provides that "[r]easonable attorney's fees may be awarded against the nonprevailing party; provided, that such nonprevailing party has acted in bad faith." When a court awards attorney's

fees under a discretionary statutory provision, the abuse of discretion standard applicable generally to an award of attorney's fees applies. *See Madden Phillips*, 315 S.W.3d at 827. The determination of whether I & L withheld funds due to Beacon4 in bad faith is a question of fact. *See id.* at 828. Although the PPA does not define "bad faith," this Court has determined in the context of the PPA that "acts taken in bad faith involve knowing or reckless disregard for contractual rights or duties." *See id.* at 829 (citing *Trinity Indus. v. McKinnon Bridge Co.*, 77 S.W.3d 159, 181 (Tenn. Ct. App. 2001)).

In *Madden Phillips*, this Court affirmed the trial court's finding that the defendant owner had violated the PPA by withholding two payments for work completed and failing to release a retainage after having terminated the contractor's employment with ninety percent of the project completed. *Id.* at 829-30. This Court also affirmed the trial court's award of attorney's fees under the PPA, concluding that the trial court had not abused its discretion by finding that the owner had "acted in reckless disregard of [the contractor's] contractual rights." *Id.* ("In light of the trial court's findings, we conclude that [the owner] did not honestly believe it did not owe [the contractor] payment."). *See also Claiborne Hauling, LLC v. Wisteria Park, LLC*, No. E2009-02667-COA-R3-CV, 2010 WL 3219467 at *8 (Tenn. Ct. App. Aug. 16, 2010) (affirming the trial court's finding of bad faith and award of attorney's fees under the PPA upon concluding that "[w]e cannot agree that [the owner] could have honestly believed it owed [the contractor] nothing on the pending invoices, retainage, and change orders.").

The trial court in the instant action found that I & L, acting primarily through Mr. Butler as its representative, had intentionally failed to comply with the PPA and thereby demonstrated bad faith. The court made the following detailed findings of fact regarding bad faith in pertinent part:

> Mr. Butler, in his letter of November 23, 2011, states that "the undisputed retainage is $46,942.73." In addition to this statement, Mr. Butler stated in an e-mail to Mr. Ingram dated September 30, 2011:
>
> > Based on the last two pay applications and the final Change Order, here is a summary of the funds necessary to close this out.
> >
> > Pay App. 7 Site --   $54,492.44
> > Pay App. 8 Site --   $31,500.00
> > Change Order 5 --   $27,247.01
> >
> > Total --            $113,239.45

57

On December 8, 2011, Mr. Butler stated in an e-mail to Mr. Ingram that "[t]he numbers on the site contract reflect that they have a balance on their contract of $24,213.73 and we are holding retention of $46,942.75 . . . The total money we should owe Beacon4 is $71,156.48." Based on these statements, there is little doubt that I&L admitted or acknowledged the debt. There is no basis, therefore, for the Court to conclude that I&L honestly believed that it did not owe this money to Beacon4.

Even though Mr. Butler's letter of November 23, 2011 claims a basis to withhold these funds based on incomplete work or the need for corrective work, Mr. Butler never obtained or secured an estimate for any corrective work. Section 5.1.7 of the Site Contract required the Architect to make this determination in order to withhold funds after completion of the work and based on Mr. Butler's testimony, the work under the Site Contract was completed in the Fall of 2011.[18] More importantly, Mr. Ingram testified that I&L had no claims that it was asserting against Beacon4 for incomplete work.

Even assuming Mr. Butler's claims regarding necessary corrective work had some merit or basis in fact, which the Court finds they did not, § 66-34-204(3) of the *Prompt Pay Act* trumps that claim. Again, this statute states that the retention "must be paid." The Court, in reaching its decision that I&L acted in bad faith also takes into account that Mr. Butler's testimony reflects that he essentially summarily dismissed any assertion that Beacon4 had rights under the *Prompt Pay Act*. By relying on Mr. Butler's legal advice rather than on competent counsel, which at that time I&L had the means and ability to hire, I&L is bound by Mr. Butler's conduct and actions.

The Court concludes that I&L, through Mr. Butler, acted in reckless disregard of Beacon4's contractual rights. Mr. Butler made unilateral deductions to Beacon4's Change Order requests when he had no right under the Site Contract or General Conditions to do so. He refused to mediate claims of Beacon4 when he had a contractual obligation to do so. He unilaterally processed Change Orders rescinding prior Change Orders approvals and, thereby, unilaterally reducing the amount due under the Site

---

[18] Section 5.1.7.1 of the Site Contract provides in relevant part that the progress payment amount determined by the architect "shall be further modified under the following circumstances . . . Add, upon Substantial Completion of the Work, a sum sufficient to increase the total payments to the full amount of the Contract Sum, less such amounts as the Architect shall determine for incomplete Work, retainage applicable to such work and unsettled claims; . . ."

Contract. He refused to unconditionally release the retainage due Beacon4 when he had a contractual obligation to do so. These acts, when viewed collectively, show a conscious intent by Mr. Butler on behalf of I&L to disregard the terms of the parties' contract in an effort to take advantage of Beacon4 because he knew Beacon4 needed the money to pay its subcontractors and to benefit I&L.

Mr. Butler wore several hats on the Project. His firm was the Architect of record. He was the Initial Decision Maker under the Site Contract. He drew and administered both contracts and made all decisions relative thereto for I&L. Based on Mr. Russell's testimony, Mr. Butler also acted as the mediator when disputes between Beacon4 and I&L were formalized. The General Conditions charged Mr. Butler with the duty when making interpretations and decisions of the contract documents, "[to not] show partiality to either [Owner or Contractor]." [the General Conditions § 4.2.12.]

When Mr. Butler received Mr. Taylor's initial demand letter, his response and advice to Mr. Ingram was for "the fire for the 'scorched earth' [to be] ignited." This is a "long way" from impartiality. This also reflects an intent by I&L to use whatever was at its disposal to take advantage of Beacon4.

The Court concludes, for the reasons previously stated, that Mr. Butler violated this duty of impartiality as the evidence is overwhelming that, during the course of the Project and thereafter, Mr. Butler showed complete and unequivoca[l] partiality to I&L.

Mr. Butler's language was crude, vulgar and unprofessional. This is evidenced by the general tone of his language in communicating with Beacon4 and specifically with his language that is contained in Trial Exhibits Nos. 148 and 158 [respectively, electronic mail chains with Mr. Taylor regarding alleged deficiencies and Mr. Gladney regarding disputed CORs]. The Court finds Mr. Butler's language reprehensible and that it has no place in today's commercial world. Although the use of this language may not in and of itself be bad faith, Mr. Butler used this as part of his overall tactics to "bully" his way to obtain what he wanted, all for the benefit of I&L. Such conduct, especially since Mr. Butler was supposed to be impartial, is bad faith in the context of commercial dealings between reasonable parties.

The Court further concludes that Mr. Butler was dishonest or failed to act in a manner consistent with the good faith concept of "honesty in fact." He approved for payment portions of Beacon4's requested Change Orders for a number of items and then unilaterally rescinded his agreements which are identified below:

(a)     S1 (Fire Protection Vault) – Approved on May 1, 2011. Unilaterally rescinded on December 12, 2011.

(b)     S2B (Additional Excavation) – Approved on September 30, 2011. Unilaterally rescinded on November 21, 2011.

(c)     S13 (Sitework – Seeding) – Approved on September 30, 2011. Unilaterally rescinded on November 21, 2011. On the seeding issue, Mr. Butler actually met with Mr. Davis and agreed to pay an additional $1,500.00. He even prepared and executed a Change Order approving the additional $1,500.00. He later unilaterally rejected the $1,500.00 as well.

(d)     S5 (FP Vault Electrical) – Approved on June 21, 2011. Rescinded on December 12, 2011.

(e)     After the Building Contract was closed and "full and final releases signed[,"] Mr. Butler recomputed the amounts due and arrived at an overpayment of $3,470.46. He then offset that amount against the alleged balance due under the Site Contract. This was done after Beacon4 signed full releases on the Building Contract and was without a legal basis to challenge the offset. Further, the Site Contract and the General Conditions provided no contractual basis for such an offset to be taken.

The Court notes that each of the unilateral changes by Mr. Butler were made after Beacon4 made a demand for payment. The Court further notes that each of these unilateral changes made by Mr. Butler benefited I&L by reducing the contract balance. The Court rejects any notion that these changes or their timing were coincidental. The Court concludes that this conduct by Mr. Butler on behalf of I&L establishes that it was I&L's intent to implement a "scorched earth policy" and use the fact that I&L controlled the money to take conscious advantage of Beacon4.

60

In sum, the Court concludes that I&L acted in bad faith and awards Beacon4 its reasonable attorney's fees.

(Paragraph numbering and additional internal citations to record omitted.)

Specifically regarding the relevant witnesses' credibility, the trial court stated in its written opinion:

Most of the facts in dispute involve the credibility of Mr. Russell, Mr. Davis and Mr. Butler. The Court finds Mr. Russell's testimony to be credible; it finds Mr. Davis' testimony to be very credible and it finds Mr. Butler's testimony not to be credible. In making this assessment, the Court has considered the witnesses' demeanor, their competency, their forthrightness, their objectivity and the consistency of their testimony as previously discussed herein.

I & L bases its argument that it did not act in bad faith on its contention that Beacon4 did not include the same scope of work in the Site Contract and Grading Subcontract. Having reviewed this argument thoroughly in a previous section of this opinion, we do not find it to be a persuasive defense for I & L's violation of the PPA. As in *Madden Phillips* and *Claiborne Hauling*, we cannot agree that I & L could have honestly believed it owed Beacon4 nothing on the retainage and disputed change order requests. *See Madden Phillips*, 315 S.W.3d at 829; *Claiborne Hauling*, 2010 WL 3219467 at *8. Upon review of the record and the trial court's factual determinations in this regard, we discern insufficient evidence to overturn the trial court's conclusion that I & L acted in bad faith. *See, e.g., Madden Phillips*, 315 S.W.3d at 829 ("Factual determinations of good or bad faith often turn on credibility and may be entitled to a high degree of deference on appeal.") (citing *Worsham v. Action Realtors, Inc.*, No. 03A01-9412-CV-00428, 1995 WL 238398 at *3 (Tenn. Ct. App. Apr. 21, 1995)).

2. Reasonableness Factors

I & L also asserts that the trial court erred in its award of reasonable attorney's fees and expenses because Beacon4 initially failed to fully comply with the trial court's request for an itemized statement of fees and expenses incurred and to address all of the reasonableness factors contained within Tennessee Supreme Court Rule 8, Rule of Professional Conduct 1.5(a). I & L also asserts that the trial court should have considered indications that Beacon4 may not have been the client responsible for paying attorney Dessauer's legal fees. Beacon4 maintains that the trial court did not abuse its discretion in determining a reasonable amount of attorney's fees upon properly considering both Beacon4's original affidavit of attorney's fees and expenses and its reply to I & L's

response to the affidavit. Beacon4 also insists that I & L presented no evidence supporting its allegation that Beacon4 did not incur attorney's fees in this matter. We discern no abuse of discretion in the trial court's determination of reasonable attorney's fees.

Tennessee Supreme Court Rule 8, Rule of Professional Conduct 1.5(a) sets forth the factors to be considered in determining the reasonableness of attorney's fees, providing:

(a)  A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:

  (1)  the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

  (2)  the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

  (3)  the fee customarily charged in the locality for similar legal services;

  (4)  the amount involved and the results obtained;

  (5)  the time limitations imposed by the client or by the circumstances;

  (6)  the nature and length of the professional relationship with the client;

  (7)  the experience, reputation, and ability of the lawyer or lawyers performing the services;

  (8)  whether the fee is fixed or contingent;

  (9)  prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and

(10)     whether the fee agreement is in writing.

Contrary to I & L's first argument, a trial court properly may exercise its discretion and consider the applicable factors in determining a reasonable amount of attorney's fees even if an attorney's affidavit of fees fails to address all of the factors to be considered or, depending on the circumstances, even in the absence of an affidavit of attorney's fees. *See, e.g., Moran v. Willensky*, 339 S.W.3d 651, 664-65 (Tenn. Ct. App. 2010), *perm. app. denied* (Tenn. Sept. 1, 2010).  As this Court explained in *Moran*:

> Although Ms. Moran did not submit an itemization and supporting affidavit outlining the attorney's fees she paid, it was not mandatory that she do so.  A trial court may fix the fees of lawyers with or without expert testimony of lawyers and with or without a *prima facie* showing by plaintiffs of what a reasonable fee would be.  *Wilson Mgmt. Co. v. Star Distrib. Co.,* 745 S.W.2d 870, 873 (Tenn. 1988).  The trial judge may feel that the proceedings have sufficiently acquainted him or her with the appropriate factors to make a proper award of an attorney's fee without proof or opinions of other lawyers.  *Kahn v. Kahn,* 756 S.W.2d 685, 696-97 (Tenn. 1988).  Therefore, reversal of a fee award is not required merely because the record does not contain proof establishing the reasonableness of the fee.  *Kline v. Eyrich,* 69 S.W.3d 197, 210 (Tenn. 2002).  Should a dispute arise as to the reasonableness of the fee awarded, then in the absence of any proof on the issue of reasonableness, it is incumbent upon the party challenging the fee to pursue the correction of that error in the trial court by insisting upon a hearing on that issue, or to convince the appellate courts that he was denied the opportunity to do so through no fault of his own.  *Id.* (citing *Wilson Mgmt. Co.,* 745 S.W.2d at 873); *Kahn,* 756 S.W.2d at 697.  Absent a request for a hearing by the party dissatisfied by the award, a trial court is not required to entertain proof as to the reasonableness of the amount of attorney's fees awarded.  *Richards v. Richards,* No. M2003-02449-COA-R3-CV, 2005 WL 396373, at *15 (Tenn. Ct. App. Feb. 17, 2005).

*Moran*, 339 S.W.3d at 664-65.

In finding that Beacon4 was entitled to reasonable attorney's fees and out-of-pocket expenses, the trial court in its April 23, 2015 judgment directed Beacon4 to file, *inter alia*, an application for an award of attorney's fees and expenses within ten days of entry of the judgment.  On May 1, 2015, Beacon4 timely filed a motion for discretionary costs, application for award of attorney's fees, and affidavit of attorney Dessauer, as well as a computation of interest and a notice of hearing, notifying I & L of an anticipated

63

hearing date on May 22, 2015. I & L filed a response on May 8, 2015, asserting, *inter alia*, that the application for attorney's fees did not contain (1) an itemized statement of attorneys' time and activities, (2) a description of the fee customarily charged in the locality for similar legal services, or (3) the relationship between the amount of damages involved in the case and the results obtained.

On May 18, 2015, Beacon4 filed a reply to I & L's response concomitantly with a supplemental affidavit completed by Mr. Dessauer. The reply delineated legal services in detail that had been summarized in the original application. Mr. Dessauer in his supplemental affidavit described his familiarity with commercial law in eastern Tennessee; the complexity involved in the trial at issue; and his opinion, based on his experience and knowledge of fees charged by other similarly experienced attorneys in the locality, that the fees for which he applied were reasonable. Mr. Dessauer also emphasized that his firm's client and retention agreement was with Beacon4.

The trial court initially entered an amended judgment on May 18, 2015, awarding to Beacon4 the original $150,390.04 judgment; interest in the amount of $31,715.76; attorney's fees in the amount of $102,163.50; and out-of-pocket expenses in the amount of $8,495.10. On May 29, 2015, I & L filed a surrebuttal to Beacon4's reply, insisting, *inter alia*, that the trial court should not consider the supplement to Beacon4's application for attorney's fees. Subsequently finding that it had inadvertently failed to receive I & L's timely filed response to Beacon4's post-judgment pleadings, the trial court set aside its amended judgment on June 1, 2015. On June 3, 2015, the court entered an agreed order awarding to Beacon4 discretionary costs in the amount of $4,464.95. Thereafter, upon review of all the above pleadings, the trial court entered a final judgment on June 19, 2015, *inter alia* confirming its prior awards to Beacon4 of attorney's fees, out-of-pocket expenses, and interest.

I & L presents no authority, and our research has revealed none, to support I & L's argument that the trial court erred by considering Mr. Dessauer's supplemental affidavit and Beacon4's reply to I & L's response. *See, e.g., Outdoor Mgmt., LLC v. Thomas*, 249 S.W.3d 368, 379 (Tenn. Ct. App. 2007), *perm. app. denied* (Tenn. Sept. 17, 2007) (affirming the trial court's award of attorney's fees, which the trial court granted upon consideration of the attorney's affidavit and spontaneously filed supplemental affidavit). We note that the "summary" of fees attached to Mr. Dessauer's original affidavit delineated month-by-month "the attorneys involved, the time spent by such attorneys, the hourly rates charged by such attorneys, and the itemized expenses . . . ." The itemized fees attached to the supplemental affidavit then delineated charges more particularly. Moreover, upon our thorough review of the voluminous record of the five-day trial and surrounding proceedings, we determine that the chancellor possessed sufficient knowledge of the case to acquaint him with the factors relevant to determination of a

reasonable award of attorney's fees. *See, e.g., Madden Phillips*, 315 S.W.3d at 831 ("There is no indication that the trial judge's involvement throughout the parties' legal proceedings, including four days of trial, did not sufficiently acquaint him with the factors relevant to the determination of a reasonable award.").

I & L also insists that Beacon4 did not incur attorney's fees, based upon I & L's allegation that Mr. Davis or VDC entered into an agreement with Beacon4's counsel to pay the attorney's fees in this matter. I & L thereby maintains that any attorney's fees incurred by Mr. Davis or VDC should not be awarded to Beacon4 because the trial court's April 23, 2015 judgment awarded attorney's fees only to the prevailing party, Beacon4. *See* Tenn. Code Ann. § 66-34-602(b) (providing for an award of reasonable attorney's fees "against the nonprevailing party; provided, that such nonprevailing party has acted in bad faith."). I & L bases its allegations in this regard on (1) invoices attached to Mr. Dessauer's supplemental affidavit that are addressed to "Beacon4, LLC, c/o Vic Davis" at a post office box in Kingsport, Tennessee; and (2) a purported September 2013 agreement between Mr. Davis and Mr. Dessauer's firm that was never admitted into evidence.

We agree with Beacon4 that the address utilized on the invoices reflects only that Beacon4, based in Alabama, was the law firm's client and that Beacon4 was receiving mail "care of" its grading subcontractor, Mr. Davis, who was located in Tennessee. Regarding the purported agreement, on September 26, 2014, Beacon4 filed a motion in limine, requesting that the trial court preclude a September 13, 2013 agreement between Beacon4 and VDC from entry into evidence at trial based on the attorney-client privilege and the common interest privilege. *See generally Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 212-14 (Tenn. Ct. App. 2002) (explaining that the attorney-client privilege "serves the administration of justice by encouraging full and frank communication between clients and their attorneys by sheltering these communications from compulsory disclosure" and that the common interest privilege "extends the scope of the attorney-client privilege by providing an exception to the general rule that communications made in the presence of or shared with third parties are not protected by the attorney-client privilege.") (footnote omitted). Beacon4 stated in its motion in limine that the agreement had been inadvertently produced during discovery. I & L explained in its response to Beacon4's application for attorney's fees that upon I & L's motion to compel the purported agreement prior to Mr. Davis's deposition, the trial court conducted a hearing. Following the hearing, the court declined to compel production but granted the parties leave to submit additional information regarding the issue after Mr. Davis's deposition. I & L acknowledges that following the deposition, I & L determined the document to be "irrelevant to the issues in the suit."

At the opening of trial, Beacon4's counsel raised "the preliminary matter of the Motion in Limine." The trial court stated that it did not have enough information at that time to determine the relevance of the document in question. Beacon4's counsel stated: "Very well, Your Honor. We can defer that and if it's offered can address it at that time." I & L did not proffer the purported agreement as evidence or otherwise request its production during trial. Not until its response to Beacon4's application for attorney's fees did I & L renew its request to have the trial court order Beacon4 to produce the purported agreement. In its final judgment, the trial court stated in pertinent part:

> The Court also finds that the request by [I & L] for the Court to review the contract between [Beacon4] and Vic Davis Construction, Inc., should be denied because the contract was not introduced as evidence at the trial and because it was not proffered as evidence at the trial.

We agree with the trial court regarding the production of this document. I & L did not raise an issue at the close of trial regarding the purported agreement that had been the subject of Beacon4's motion in limine. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). The record contains no indication that I & L requested an evidentiary hearing regarding Beacon4's application for attorney's fees. *See Moran*, 339 S.W.3d at 665 ("Absent a request for a hearing by the party dissatisfied by the award, a trial court is not required to entertain proof as to the reasonableness of the amount of attorney's fees awarded."). We emphasize that pursuant to Tennessee Rule of Appellate Procedure 13(c), this Court "may consider those facts established by the evidence in the trial court and set forth in the record and any additional facts that may be judicially noticed or are considered pursuant to Rule 14 [regarding post-judgment facts]." The record simply contains no proof that Beacon4 did not incur attorney's fees owed to Mr. Dessauer.[19] The trial court did not abuse its discretion by awarding to Beacon4 reasonable attorney's fees in the amount of $102,163.50 and out-of-pocket expenses in the amount of $8,495.10.

We do note, however, an apparent typographical error in the amount of interest awarded to Beacon4 in the final judgment. I & L has raised no issue regarding Beacon4's computation of the six-percent interest awarded, which Beacon4 submitted in the amount of $31,715,76. In its May 18, 2015 amended judgment, the trial court

---

[19] Mr. Dessauer in both his original and amended affidavits of attorney's fees stated that his "Firm's client and retention agreement in this case was with Beacon4, LLC." I & L would have us construe this statement as glaringly lacking an indication that Beacon4 actually owed attorney's fees to Mr. Dessauer's firm. We decline I & L's invitation to read Mr. Dessauer's affidavits as so closely splitting hairs concerning the nature of his firm's legal representation.

adopted Beacon4's computation and awarded interest in the amount of $31,715.76. However, when the trial court subsequently entered its final judgment confirming the awards to Beacon4, the court, without explanation, set the interest in the amount of $32,715.76. We determine this unexplained addition of $1,000.00 to be a typographical error and modify the final judgment accordingly to award the original amount of interest to Beacon4 of $31,715.76.

## C. Statutory Penalty

Beacon4 raises the additional issue of whether the trial court erred by declining to impose against I & L the statutory penalty of $3,000.00 per day provided by Tennessee Code Annotated § 66-34-103(e). I & L argues that the trial court correctly found that the statutory penalty is not available as a civil remedy. We agree with I & L in this regard.

The version of Tennessee Code Annotated § 66-34-103(e) applicable to the instant action provided:

> (e)(1) It is an offense for a person, firm or corporation to fail to comply with subsection (a) or (b) or § 66-34-104(a).
>
> (2)(A) A violation of this subsection (e) is a Class A misdemeanor, subject to a fine only of three thousand dollars ($3,000).
>
> (B) Each day a person, firm or corporation fails to comply with subsection (a) or (b) or § 66-34-104(a) is a separate violation of this subsection (e).
>
> (C) Until the violation of this subsection (e) is remediated by compliance, the punishment for each violation shall be consecutive to all other such violations.

The plain language of the statute that an "offense" is a "Class A misdemeanor," *see* Tenn. Code Ann. § 66-34-103(e)(1)-(2), indicates that the $3,000.00-per-day statutory penalty to be imposed for failure to comply with § 66-34-104(a) or (b) is a criminal penalty. *See In re Estate of Tanner,* 295 S.W.3d at 614 ("When a statute is clear, we apply the plain meaning without complicating the task."). Beacon4 posits that this Court should apply the factors set forth in this Court's recent decision in *Hardy v. Tournament Players Club at Southwind, Inc.*, No. W2014-02286-COA-R9-CV, 2015 WL 4042490 (Tenn. Ct. App. July 2, 2015), *perm. app. granted* (Tenn. Dec. 9, 2015), to determine that Tennessee Code Annotated § 66-34-103(e) creates a civil remedy or private right of action.

In *Hardy*, this Court addressed the issue of whether the Tennessee Wage Regulation Act ("TWRA"), specifically Tennessee Code Annotated § 50-2-107 (2014), creates a private right of action against employers who fail to pay employees gratuities they have earned. *Hardy*, 2015 WL 4042490 at *1. In concluding that section 50-2-107 of the TWRA does create a private right of action, the *Hardy* Court employed this Court's analysis in *Owens v. Univ. Club of Memphis*, No. 02A01-9705-CV-00103, 1998 WL 719516 (Tenn. Ct. App. Oct. 15, 1998), explaining:

> Relying on the standard set-forth in *Buckner v. Carlton,* a published opinion of this Court that relied, in turn, on the United States Supreme Court's decision in *Cort v. Ash*, [422 U.S. 66, 78 (1975),] the *Owens* court stated that, when determining whether a private right of action exists for the violation of a criminal statute, the court must consider three primary factors:
>
>> First, is the plaintiff one of the class for whose especial benefit the statute was enacted. Second, is there any indication of legislative intent, explicit or implicit, either to create or deny a private cause of action. Third, is the private cause of action consistent with the underlying purposes of the legislation.
>
> *Owens,* 1998 WL 719516, at *10 (quoting *Buckner v. Carlton,* 623 S.W.2d 102, 105 (Tenn. App. 1981) (quoting *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975))) (internal citations omitted).

*Hardy*, 2015 WL 4042490 at *5. As noted in *Hardy*, our Supreme Court applied the same test in *Brown v. Tenn. Title Loans, Inc.*, 328 S.W.3d 850 (Tenn. 2010), to conclude that under the version of the Tennessee Title Pledge Act applicable to the action at issue in *Brown*, no private right of action was available "on behalf of pledgors against title pledge lenders for charging excessive interest and prohibited fees." *See Brown*, 329 S.W.3d at 863; *Hardy*, 2015 WL 4042490 at *7-8.

As to the PPA, however, we conclude that the above analysis is of limited value because the statute clearly provides separate and distinguishable civil and criminal remedies. In other words, it is clear from the plain language of the statute that Tennessee Code Annotated § 66-34-103(e) does not create a private right of action because a private right of action is fully created in a clearly distinguishable part of the PPA. Part 6 of the PPA, entitled "Remedies for Delinquent Payment or Nonpayment," sets forth civil remedies available to plaintiffs for whose benefit the statute was enacted, "[a] contractor

who has not received payment from an owner, or a subcontractor, materialman or furnisher who has not received payment from a contractor or other subcontractor, materialman or furnisher . . . ." *See* Tenn. Code Ann. § 66-34-602(a)(1). The statute further provides that with proper notice, the aggrieved party "may, in addition to all other remedies available at law or in equity, sue for equitable relief, including injunctive relief, for continuing violations of this chapter, in the chancery court of the county in which the real property is located." *See* Tenn. Code Ann. § 66-34-602(a)(3).

In contrast, Tennessee Code Annotated § 66-34-103(e) provides that failure to comply with the requirements regarding the withholding of a retainage, specifically as set forth in subsections -103(a) and -103(b), is a Class A misdemeanor, subject to a fine of $3,000.00 per day. As further indication of the legislative intent underlying creation of this criminal penalty, the General Assembly has amended Tennessee Code Annotated § 66-34-103(e), effective July 1, 2012, to add the following:

> (3)    In addition to the fine imposed pursuant to subdivisions (e)(2)(A) and (B), the court shall order restitution be made to the owner of the retained funds. In determining the appropriate amount of restitution, the formula stated in § 40-35-304 shall be used.

*See* 2012 Pub. Acts, Ch. 609 § 1 (H.B. 2764). Although not effective until two months following commencement of the instant action, this amendment does indicate the General Assembly's intent to provide a separate order of restitution to a contractor owed retained funds in the event that a criminal misdemeanor violation is found.

Tennessee Code Annotated § 40-35-304, referenced in the newly enacted subsection 66-34-103(e)(3), is contained within the Tennessee Criminal Sentencing Reform Act of 1989. As the trial court noted, Tennessee Code Annotated § 40-35-304(h) (2014) provides that "upon expiration of the time of payment or the payment schedule imposed pursuant to subsection (c) or (g), if any portion of restitution remains unpaid, then the victim or the victim's beneficiary may convert the unpaid balance into a civil judgment in accordance with the procedure set forth in this subsection (h)." Therefore, as the trial court recognized, restitution to the aggrieved party, if court-ordered as the result of a criminal judgment, is separate from the $3,000.00 fine that would be levied by the court. *See* Tenn. Code Ann. § 66-34-103(e)(3).

Beacon4 also argues that a civil penalty provided in Tennessee Code Annotated § 66-34-104(c) indicates legislative intent to allow a criminal penalty imposed pursuant to Tennessee Code Annotated § 66-34-103(e) to be awarded to the party owed the unpaid retainage. We determine that the opposite is indicated. Tennessee Code Annotated § 66-34-104(c) provides:

(c)     In the event that the party withholding the retained funds fails to deposit the funds into an escrow account as provided herein, such party <u>shall be responsible for paying the owner of the retained funds an additional three hundred dollar ($300) penalty per day</u> for each and every day that such retained funds are not deposited into such escrow account.

(Emphasis added.) In contrast to the criminal penalty provided for in Tennessee Code Annotated § 66-34-103(e), the penalty provided for in section 66-34-104(c) expressly states that the $300.00-per-day penalty for failure to deposit the funds in an escrow account must be paid to the "owner of the retained funds," rather than assessed as a "fine" for commission of a Class A misdemeanor. This distinction in how the two penalties are assessed is thus further indication that the $3,000.00-per-day penalty provided for in Tennessee Code Annotated § 66-34-103(e) is available solely as a criminal sanction. *See In re Estate of Tanner*, 295 S.W.3d at 614 ("[T]he language of a statute cannot be considered in a vacuum, but 'should be construed, if practicable, so that its component parts are consistent and reasonable.'") (quoting *Marsh v. Henderson*, 424 S.W.2d 193, 196 (Tenn. 1968)).

Although a contractor who alleges that an owner has violated the retainage provisions of Tennessee Code Annotated § 66-34-103(a) or (b) could seek to have the State initiate a criminal action pursuant to Tennessee Code Annotated § 66-34-103(e), that is not the remedy Beacon4 is entitled to in this action. Beacon4 chose to file its claims in chancery court and thereby sought, *inter alia*, the civil remedies available to it under the PPA. *See also Rose Const., Inc. v. Raintree Dev. Co., LLC*, No. W2000-01388-COA-R3-CV, 2001 WL 1683746 at *5 (Tenn. Ct. App. Dec. 31, 2001), *perm. app. denied* (Tenn. Oct. 7, 2002) (explaining that the language of Tenn. Code Ann. § 66-34-602(a)(3) is "permissive rather than mandatory," meaning that, in the context of whether a party may choose arbitration to pursue a claim for attorney's fees, "a suit in chancery court is not the exclusive remedy for recovery of attorney's fees under the [PPA]."). The trial court correctly found that the $3,000-per-day fine provided for in Tennessee Code Annotated § 66-34-103(e) is not a remedy available in a civil action under the PPA.

VIII. Attorney's Fees on Appeal

Beacon4 has requested attorney's fees on appeal pursuant to the PPA, specifically Tennessee Code Annotated § 66-34-602(b), which provides for an award of reasonable attorney's fees to the prevailing party upon a finding that the nonprevailing party has acted in bad faith. The PPA does not expressly provide for attorney's fees on appeal. Beacon4 requests that this Court extend the holding of our Supreme Court's decision in

*Killingsworth v. Ted Russell Ford, Inc.*, 205 S.W.3d 406, 409-10 (Tenn. 2006), to determine that attorney's fees on appeal may be awarded under the PPA as the *Killingsworth* Court determined such fees could be awarded in an action filed under the TCPA. As a matter of first impression, we hold that the PPA allows for an award of reasonable attorney's fees on appeal, provided that the plaintiff's burden of proving bad faith on the part of the defendant has been met. *See* Tenn. Code Ann. § 66-34-602(b). We further conclude that such an award to Beacon4 is appropriate in this action.

In *Killingsworth*, our Supreme Court held that although the statutory provision allowing a reasonable award of attorney's fees does not expressly provide for attorney's fees on appeal, "the TCPA should be construed so as to allow an award of reasonable attorney's fees generated during an appeal . . . ." *See Killingsworth*, 205 S.W.3d at 409. Although this holding was narrowly focused on the TCPA, *id.*, the *Killingsworth* Court did cite with approval an earlier decision, *Forbes v. Wilson Cnty. Emergency Dist. 911 Bd.*, 966 S.W.2d 417, 422 (Tenn. 1998), holding that a statute providing for an award of attorney's fees under the Tennessee Human Rights Act ("THRA") should be construed to allow an award of attorney's fees on appeal. *See Killingsworth*, 205 S.W.3d at 409 ("Our decision in *Forbes* makes clear that legislative provisions for an award of reasonable attorney's fees need not make a specific reference to *appellate* work to support such an award where the legislation has broad remedial aims.") (emphasis in original) (citing *Forbes*, 966 S.W.2d at 422)).

As the Court explained:

> The THRA and the TCPA both contain sections setting forth the purpose and intent of the respective statutes. In very general terms, the THRA is intended to assure Tennessee has "appropriate legislation prohibiting discrimination in employment, public accommodations and housing . . . ." *See* Tenn. Code Ann. § 4-21-101(a)(2). The TCPA, on the other hand, is intended "to protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within this state." *See* Tenn. Code Ann. § 47-18-102(2). The TCPA further provides that its provisions "shall be liberally construed to promote" the statute's purpose. Tenn. Code Ann. § 47-18-102. While the THRA and the TCPA certainly are aimed at remedying vastly different wrongs, they both are comprehensive legislation intended to protect the citizens of Tennessee.

*Killingsworth*, 205 S.W.3d at 410 (quoting *Killingsworth v. Ted Russell Ford, Inc.*, No. E2004-02597-COA-R3-CV, 2006 WL 26355 at *5 (Tenn. Ct. App. Jan. 5, 2006)).

Our Supreme Court has defined "remedial" statutes as "'[l]egislation providing means or method whereby causes of action may be effectuated, wrongs redressed and relief obtained . . . ." *Nutt v. Champion Int'l Corp.*, 980 S.W.2d 365, 368 (Tenn. 1998) (quoting *State Dep't of Human Servs. v. Defriece,* 937 S.W.2d, 954, 958 (Tenn. Ct. App. 1996)). "'Statutes that create a new right of recovery or change the amount of damages recoverable are, however, deemed to have altered the parties' vested right and thus are not considered remedial.'" *Nutt*, 980 S.W.2d at 365 (quoting *Shell v. State,* 893 S.W.2d 416, 420 (Tenn. 1995)). For instance, in *Nutt*, the Court determined that an amendment to the Workers' Compensation statutory scheme was not remedial because it operated to "affect[] the substantive rights of the employee by allowing offsets to the workers' compensation award." *Nutt*, 908 S.W.2d at 368 (analyzing Tenn. Code Ann. § 50-6-114)).

The General Assembly enacted the PPA in 1991 "to provide for timely payments to contractors, subcontractors, materialmen, furnishers, architects, and engineers and to provide for interest on late payments." 1991 Pub. Acts Ch. 45 (H.B. 875). We determine the PPA in general to have remedial aims in that it operates to effectuate the means by which those it was designed to protect may recover their already existing property and contractual rights in funds they have earned.[20] Legitimate business enterprises and consumers as a whole are then protected from the consequences of contractors, subcontractors, materialmen, furnishers, architects, and engineers receiving less than they have bargained for and earned.

We therefore hold that the provision of the PPA allowing an award of reasonable attorney's fees upon a finding of bad faith also provides for an award of reasonable attorney's fees on appeal, provided that the appellant has requested such fees in appellate pleadings. *See Killingsworth*, 205 S.W.3d at 411 ("We hold that a plaintiff seeking to recover reasonable attorney's fees generated during an appeal of a case brought under the TCPA must set forth his or her intention to do so in his or her appellate pleadings."). To hold otherwise would be to run the risk of "de-remedying" plaintiffs awarded attorney's fees pursuant to Tennessee Code Annotated § 66-34-602(b). *See Killingsworth*, 205 S.W.3d at 410 (explaining that because a "wronged plaintiff's monetary judgment is at

---

[20] We recognize that the question of whether a particular statute or amendment is remedial is often considered within the context of whether the subject legislation may be applied retrospectively. *See, e.g., Anderson v. Memphis Hous. Auth.*, 534 S.W.2d 125, 128 (Tenn. Ct. App. 1975) (reversing the trial court's retrospective application of a statutory amendment upon holding in part that "the Amendment in question is one that does not merely enlarge or affect a procedure for the enforcement of an existing right, but on the contrary, creates a new right of recovery . . . ."). We emphasize that here we are addressing the broad aims of the PPA only within the context of the availability of attorney's fees under an existing provision of the statute. Inasmuch as the rights afforded by specific provisions of and amendments to the statutory scheme would require individual analysis, we make no determination regarding retrospective application of any part of the PPA.

risk of being consumed by the resulting appellate attorney's fees . . . [a] plaintiff successful at trial is therefore at risk of being 'de-remedied' if unable to collect his or her reasonable appellate legal fees.").

Beacon4 properly requested reasonable attorney's fees in its appellate pleadings. Having previously determined that the trial court did not abuse its discretion by awarding to Beacon4 reasonable attorney's fees upon a finding of bad faith on the part of I & L in violating the PPA, we further determine that an award to Beacon4 of reasonable attorney's fees on appeal is appropriate. We remand this matter to the trial court for a determination of the proper amount of reasonable fees incurred by Beacon4 during the appellate process.

## IX. Conclusion

For the reasons stated above, we affirm the trial court's judgment with one modification. To correct a typographical error in the amount of interest awarded to Beacon4, we modify the interest award to $31,715.76 from the interest award in the final judgment of $32,715.76. We affirm the trial court's judgment in all other respects. We grant Beacon4's request for an award of reasonable attorney's fees on appeal. This case is remanded to the trial court, pursuant to applicable law, for a determination of reasonable attorney's fees incurred by Beacon4 during the appellate process, enforcement of the trial court's judgment, and collection of costs assessed below. The costs on appeal are assessed against the appellant, I & L Investments, LLC.

_____
THOMAS R. FRIERSON, II, JUDGE

73